**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PHIL ROSEN, derivatively on behalf of ALPHABET, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>SUNDAR PICHAI, LARRY PAGE, SERGEY BRIN, JOHN L. HENNESSEY, FRANCES H. ARNOLD, R. MARTIN CHAVEZ, L. JOHN DOERR, ROGER W. FERGUSON JR., K. RAM SHRIRAM, ROBIN L. WASHINGTON, ANAT ASHKENAZI, RUTH M. PORAT, and KENT WALKER,<br><br>Defendants,<br><br>– and –<br><br>ALPHABET, INC.,<br><br>Nominal Defendant. | No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Phil Rosen ("Plaintiff"), derivatively on behalf of Alphabet, Inc. ("Alphabet" or the "Company"), alleges the following based on personal knowledge as to Plaintiff and Plaintiff's acts and as to all other matters on information and belief based on the investigation of Plaintiff's counsel, which included, among other things, a review of legal and regulatory filings, press releases, Alphabet's online documents, media reports about Alphabet and other public statements issued by the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff on behalf of Alphabet against certain of its officers and directors for adopting and implementing an unlawful business strategy whereby Alphabet used copyrighted materials by writers, artists, and musicians, and voiceprints of biometric identifiers, including human speech and commercial voices, to develop its Artificial Intelligence ("AI") services.

2. Alphabet is a collection of businesses, the largest of which includes Google LLC ("Google"), Google Services, Google Cloud, and non-Google businesses collectively defined as "Other Bets," in the United States, Europe, Middle East, Africa, Asia-Pacific, and Latin America. The Google Services segment provides products and services, including ads, Android, Chrome, devices, Gmail, Google Drive, Google Maps, Google Photos, Google Play, Search, and YouTube. The Google Cloud segment offers consumption-based fees and subscriptions for AI solutions, including AI infrastructure, Vertex AI platform, and Gemini enterprise. The Other Bets segment sells transportation and internet services.

3. Alphabet's structure is designed to control and assist all businesses to prosper through Alphabet's leaders, including all of Alphabet's members of its board of directors ("Directors") and Alphabet's executive officers ("Officers"). Alphabet Inc. was incorporated in 2015 and is headquartered in Mountain View, California. Google was incorporated in 1998, and is also headquartered in Mountain View, California. Alphabet and Google also have primary corporation centers in Chicago, Illinois.

4. Alphabet's Google AI models include multiple AI software products referred to as large language models ("LLMs") and text-to-image models ("T2I models"), created, maintained and commercialized by Alphabet through Google. Alphabet's LLMs and T2I models related to copyrighted works developed by writer and artists, include Bard, Gemini, Imagen, Imagen 2, which are integrated into multiple Alphabet products that include Google Search, Google Cloud, Gmail, Google Docs, Google Ads, Google Slides, Chrome, YouTube, Google Photos, Google Sheets, Google Meet, Google Pixel, Google

Maps, Google AI Studio, Google Vids, Google Workspace, Google Brain, Vertex AI SoundStream, Gemini, Dream Track, MusicFX DJ, Music AI Sandbox, and Magenta RealTime. Alphabet's LLMs related to copyrighted works developed by musicians, sound recordings, musical compositions, and lyrics, include Lyria, Lyria 2, Lyria 3, MuLan, and MusicLM.

5. Alphabet and Google trained its LLMs and T2I models based on unlawfully copied copyrighted materials pulled up from multiple pirated datasets, including Z-Library, the LAION-400M dataset, the LAION-5B dataset, the 'img2dataset' that extracted images from LAION-440M, and pulled out sound recordings, musical compositions, and lyrics from YouTube and Magenta.

6. Alphabet's Google AI models also include the training and deployment of generative AI models, voice synthesis, voice cloning, and voice-conversion models, that developed multiple commercial voice models ("CVMs") for Alphabet's commercial voice AI products. Alphabet distributes these CVMs through Gemini Live, NotebookLM Audio Overviews, YouTube auto-dubbing, Google Cloud Text-to-Speech, and Google Assistant, collectively on more than a billion devices.

7. Alphabet ingested within each of these CVMs hundreds of thousands of hours of human speech recordings and extracted the unique biometric signatures and the voiceprints of the speakers from those recordings. In violation of the Illinois Biometric Information Privacy Act ("BIPA"), the Defendants failed to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting that speaker's recording into the training pipeline, which resulted in damages to the source speakers.

8. Defendants are all directors and/or officers of Alphabet who knew of the copyright and BIPA violations being perpetrated through Alphabet's AI models, including the LLMs, the T2I models, and the CVMs. Rather than utilize a clean dataset that did not include copyrighted books, cartoons, illustrations, digital images, and commercialized

voiceprints, Defendants followed the "ask forgiveness not approval" model and adopted and implemented an unlawful plan to use a pirated dataset to develop the Company's AI services. Defendants' misconduct constitutes bad faith and a violation of privacy law in directing, approving, or permitting the misconduct.

9. Predictably, Defendants' misconduct has resulted in multiple copyright holders and commercial voice person filing lawsuits against Alphabet and Google based on Alphabet's failure to compensate them for downloading, copying, storing, or using their copyrighted works and commercialized voiceprints, for which Alphabet is now facing potential massive liability.

10. Defendants were also well aware of the potential liability for Alphabet's unauthorized utilization of copyright infringement based on multiple individual and class action lawsuits against other corporations for copyright infringements relating to AI platforms, including: *Kadrey v. Meta Platforms, Inc*, No. 3:23-cv-3417-VC (N.D. Cal. 2023); *Concord Music Group Inc. v. Anthropic PBC*, No. 5:24-cv-03811-EKL (N.D. Cal. 2024) ("*Concord I*"); *Bartz v. Anthropic PBC*, No. 4:24-cv-05417-AMO (N.D. Cal. 2024); *In re Mosaic LLM Litigation*, No. 3:24-cv-01451-CRB (N.D. Cal. 2024); *UMG Recordings, Inc. v. Uncharted Labs, Inc.*, No. 1-24-cv-04777-AKH (S.D.N.Y. 2024); *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-VC-FDS (D. Mass. 2024); *Hendrix v. Apple Inc.*, No. 4:25-cv-07558-YGR (N.D. Cal. 2025); *Lyon v. Adobe Inc.*, No. 3:25-cv-10732-JSC (N.D. Cal. 2025); *James v. Snowflake Inc.*, No. 2:25-cv-00108-BMM (D. Mont. 2025); *Tanzer v. Salesforce Inc.*, No. 3:25-cv-08862-CRB (N.D. Cal. 2025); *Bird v. Microsoft Corp.*, No. 1:25-cv-05282 (S.D.N.Y. 2025); *Ted Entertainment, Inc. v. OpenAI, Inc.*, No. 5:26-cv-02935-BLF (N.D. Cal. 2026); *Kleiner v. Adobe Inc.*, No. 3:26-cv-01218-JSC (N.D. Cal. 2026); *Nazemian v. NVIDIA Corp.*, No. 4:24-cv-01454-JST (N.D. Cal. 2024); and *Ted Entertainment, Inc. v. Amazon.com, Inc.*, 2:26-cv-01134 (W.D. Wash. 2026).

11. Defendants are also well aware of multiple, similar BIPA lawsuits filed against other AI platform development corporations, including: *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-0374-JD (N.D. Cal. 2015); *In re TikTok, Inc. Consumer Privacy Litig.*, MDL No. 2948 (N.D. Ill. 2020); *Basich v. Microsoft Corp.*, No. 2:26-cv-00422 (W.D. Wash. 2026); *Amer v. Eleven Labs Inc.*, No. 1:26-cv-05437 (N.D. Ill. 2026); *Rogers v. NVIDIA Corp.*, No. 1:26-cv-05478 (N.D. Ill. 2026); *Marin v. Meta Platforms, Inc.*, No. 1:26-cv-05438 (N.D. Ill. 2026); *Delgado v. Meta Platforms, Inc.*, No. 3:23-cv-04181-SI (N.D. Cal. 2023); *Lacour v. Apple Inc.*, No. 1:26-cv-05536 (N.D. Ill. 2026); *Dorcus v. Adobe Inc.*, No. 1:26-cv-05575 (N.D. Ill. 2026), and *Flowers v. Microsoft Corp.*, No. 1:26-cv-05491 (N.D. Ill. 2026).

12. Indeed, another AI development company, Anthropic, paid damages of $1.5 billion to resolve the *Concord I* action. And Anthropic is now subject to additional damages of up to $3 billion in a second action filed in 2026, *Concord Music Group Inc. v. Anthropic PBC*, No. 5:26-cv-00880-EKL (N.D. Cal. 2026) ("*Concord II*"). This tidal wave of litigation filed against AI developers like Alphabet served as blazing red flags alerting Defendants of the need to prevent Alphabet from committing and continuing to commit the same unlawful conduct.

13. Copyright holders, Commercial voiceprint holders, and biometric identifiers, have filed multiple lawsuits, including class actions, against Alphabet and Google for copyright infringement and BIPA violations. On July 11, 2023, copyrighted works holders filed their class action lawsuit against Alphabet and Google, *Leovy v. Google LLC*, No. 23-cv-03440 (N.D. Cal. 2023). On April 26, 2024, copyrighted works holders filed their class action lawsuit against Alphabet and Google, *Zhang v. Google LLC*, No. 24-cv-02531 (N.D. Cal. 2024). These two actions were consolidated, and on December 20, 2024, these copyright work holders filed a consolidated amended complaint, in the action captioned and entitled *In re Google Generative AI Copyright Litigation*, No. 23-cv-03440-EKL (N.D. Cal. 2024). On March 1, 2016, commercial photograph biometric face

template identifiers filed a class action lawsuit against Google, *Rivera v. Google Inc.*, No. 1:16-cv-02714 (N.D. Ill. 2016), which settled for $100 million. In April 2021, class actions initially filed in Illinois state courts on behalf of school children whose voices and faces were placed on Google's AI platform in voice and face models were removed to the Central District of Illinois, *Farwell v. Google LLC*, 1:21-cv-01122 (C.D. Ill. 2021) and *H.K. et al. v. Google, LLC*, No. 1:21-cv-01122 (C.D. Ill. 2021), and eventually settled for $8.75 million. On March 6, 2026, copyright holders and musicians filed a class action lawsuit against Google, *Kogon v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill. 2026). On May 11, 2025, commercial voiceprint holders and biometric identifiers filed a class action lawsuit against Alphabet, *Marin v. Alphabet, Inc.*, No. 1:26-cv-05438 (N.D. Ill. 2026). Thus, Defendants were, and are, well aware of the fraudulent and bad faith misconduct that has resulted in the copyright infringement and BIPA class action filings, and the potential damages Alphabet may have to pay.

14. Alphabet is now saddled with having to defend itself in copyright infringement and BIPA violation cases as a result of Defendants' misconduct and is facing potentially massive liability and related costs and reputational damages, as well as potential loss of customers and/or claims from Alphabet customers who unwittingly used the copyright and BIPA infringing Alphabet services.

## II. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because of claims arising under 15 U.S.C. §§ 78n(a), and SEC regulations 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.14a-9. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.

16. This Court has specific jurisdiction over each named non-resident Defendant because each of the Defendants maintains sufficient minimum contacts in this District to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. At the time of the alleged wrongdoing detailed herein,

Alphabet had a principal location in this District, each of the Defendants was a director and/or officer of Alphabet, and Defendants' conduct was purposefully directed at this District. Exercising jurisdiction over any non-resident Defendant is also reasonable under the circumstances.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa. Alphabet has a principal location in this District and is subject to personal jurisdiction in this District due, in part, to violations of the BIPA based on extraction of voiceprints of Illinois residents. In addition, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Alphabet occurred in this District, and Defendants have received substantial compensation by doing business in this District and engaging in numerous activities that had an effect in this District.

## III. THE PARTIES

18. Plaintiff Phil Rosen is a current stockholder of Alphabet and has continuously owned shares of Alphabet common stock at all times relevant herein.

19. Nominal defendant Alphabet is a Delaware corporation headquartered in Mountain View, California, with a primary office located in Chicago, Illinois. Alphabet common stock trades on the Nasdaq under the ticker symbol "GOOG."

20. Defendant Sundar Pichai ("Pichai") is on Alphabet's board of directors (the "Board") and has served as Alphabet's Chief Executive Officer ("CEO") since December 2019, and Google's CEO since October 2015. Huang received roughly $10.9 million in compensation for 2025, $10.8 million in compensation for 2024, and $8.8 million in compensation for 2023, all approved by his co-defendants on the Board. As of April 24, 2026, Pichai held 1,348,607 unearned unvested shares valued at $423,192,877, and 1,642,724 vested shares valued at $336,172,535.

21. Defendant Larry Page ("Page") is Co-Founder of Google, was Alphabet's CEO from October 2015 to December 2019, Google's CEO from April 2011 to October 2015, an Alphabet director since October 2015, and a Google director since 1998. Page

currently holds 389,051,160 Alphabet Class B shares, 46.5% of all Alphabet Class B shares. Each holder of Alphabet Class B shares is entitled to ten (10) votes per share of each Alphabet Class B share vs. one (1) vote per share of Alphabet Class A shares, which provides Page with a total voting power of 27.4% of all Alphabet common stock. Collectively, all Directors and Officers have total voting power of 54.3% of all Alphabet common stock.

22. Defendant Sergey Brin ("Brin") is the Co-Founder of Google, was Alphabet's President from October 2015 to December 2019, Google's President from April 2011 to October 2015, an Alphabet director since October 2015, and a Google director since 1998. Brin currently holds 358,939,978 Alphabet Class B shares, 42.9% of all Alphabet Class B shares. Each holder of Alphabet Class B shares is entitled to ten (10) votes per share of each Alphabet Class B share vs. one (1) vote per share of Alphabet Class A shares, which, along his total 37,469 Alphabet Class A shares, provides Brin with a total voting power of 25.3% of all Alphabet common stock. Collectively, all Directors and Officers have total voting power of 54.3% of all Alphabet common stock.

23. Defendant John L. Hennessy ("Hennessy") has been Chair of the Board since 2018, was an Alphabet and Google Lead Independent Director until 2018, and a Google director as of 2004. Hennessy is the Professor of Computer Science and Electrical Engineering in the Stanford School of Engineering. Hennessy received $617,629 in Board-related compensation for 2025. Hennessy holds 20,624 shares of Alphabet Class A common stock.

24. Defendant Frances H. Arnold ("Arnold") has been an Alphabet director since 2019. Arnold is the Professor of Chemical Engineering, Bioengineering, and Biochemistry, and the Director of the Bioengineering Center, at the California Institute of Technology. Arnold received $437,396 in Board-related compensation for 2025.

25. Defendant R. Martin Chavez ("Chavez") has been an Alphabet director since 2022 and is a member of the Audit Committee. Chavez is a Partner and Vice

Chairman of Sixth Street. Chavez received $437,396 in Board-related compensation for 2025.

26. Defendant L. John Doerr ("Doerr") has been a Google director since 1999, and now also is an Alphabet director. Doerr is the Chair of Kleiner Perkins, a venture capital firm. Doerr received $437,396 in Board-related compensation for 2025. Doerr currently holds 22,348,940 Alphabet B shares, 2.7% of all Alphabet Class B shares. Each holder of Alphabet Class B shares is entitled to ten (10) votes per share of each Alphabet Class B share vs. one (1) vote per share of Alphabet Class A shares, which, along his total 472,165 Alphabet Class A shares, provides Doerr with a total voting power of 1.6% of all Alphabet common stock. Collectively, all Directors and Officers have total voting power of 54.3% of all Alphabet common stock.

27. Defendant Roger W. Ferguson Jr. ("Ferguson") has been an Alphabet director since 2016 and is the Chair of the Audit Committee. Ferguson is the Chief Investment Officer ("CIO") of Red Cell Partners LLC, a venture capital firm. Ferguson received $462,396 in Board-related compensation for 2025.

28. Defendant K. Ram Shriram ("Shriram") has been a Google director since 1998, and now is also an Alphabet director. Shriram is the managing partner of Sherpalo Ventures LLC. Shriram received $437,396 in Board-related compensation for 2025. Shriram holds 1,811,108 shares of Alphabet Class A common stock.

29. Defendant Robin L. Washington ("Washington") has been an Alphabet director since 2019 and is a member of the Audit Committee. Washington is the President and Chief Operating and Financial Officer of Salesforce, Inc. Washington received $437,396 in Board-related compensation for 2025.

30. Defendant Anat Ashkenazi ("Ashkenazi") is the Senior Vice President ("SVP") and Chief Financial Officer ("CFO") of Alphabet and Google. Ashkenazi received roughly $31.3 million in compensation for 2025, and $50 million in compensation for 2024, all approved by his co-defendants on the Board. As of April 24, 2026, Ashkenazi

held 70,760 unearned unvested shares valued at $22,204,488, and 147,637 vested shares valued at $33,269,685.

31. Defendant Ruth M. Porat ("Porat") is the President and Chief Investment Officer ("CIO") of Alphabet and Google. Porat received $29.1 million in 2025 compensation, $30.2 million in 2024 compensation, and $27.3 million for 2023 compensation, all approved by the Board. As of April 24, 2026, Porat held 164,200 unearned unvested shares valued at $45,499,431, and 177,381 vested shares valued at $38,950,630.

32. Defendant Kent Walker ("Walker") is the President of Global Affairs, Chief Legal Officer, and Secretary of Alphabet and Google. Walker received approximately $29.1 million in 2025 compensation, $30.2 million in 2024 compensation, and $27.3 million for 2023 compensation, all approved by the Board. As of April 24, 2026, Ashkenazi held 162,200 unearned unvested shares valued at $45,499,431 and 177,381 vested shares valued at $38,950,630.

33. Defendants Pichai, Arnold, Brin, Chavez, Doerr, Ferguson, Hennessy, Page, Shriram, and Washington are collectively referred to herein as the "Director Defendants." Defendants Chavez, Ferguson, and Washington are collectively referred to herein as the "Audit Committee Defendants." Defendants Pichai, Ashkenazi, Porat, and Walker are collectively referred to herein as the "Officer Defendants." The Director Defendants and the Officer Defendants are collectively referred to herein as the "Defendants."

## IV. DUTIES OF THE DEFENDANTS

### A. General Fiduciary Duties of Officers and Directors

34. By reason of their positions as officers and directors of the Company, each of the Defendants owed and owe Alphabet and its stockholders fiduciary obligations of care and loyalty and were and are required to use their utmost ability to control and manage Alphabet in a fair, just, honest, and equitable manner. Defendants were and are required

to act in furtherance of the best interests of Alphabet and not in furtherance of their personal interest or benefit.

35. Each Defendant owes to Alphabet and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

36. Defendants, because of their positions of control and authority as directors and/or officers of Alphabet, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37. Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Alphabet, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38. As senior officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act (the "Exchange Act") and traded on the Nasdaq, the Defendants also had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, its Code of Conduct, operations, products, management, and internal controls, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

39. To discharge their duties, the officers and directors of Alphabet were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.

40. At all times relevant hereto, the Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

41. Because of their advisory, executive, managerial, and directorial positions with Alphabet, each of the Defendants had access to adverse, non-public information about the Company.

42. Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Alphabet.

**B. Alphabet's Code of Conduct**

43. In addition to the fiduciary obligations owed to Alphabet, each of the Defendants were also subject to layers of Alphabet policies prohibiting certain conduct.

44. All Officer Defendants are subject to all facets of the Company's Code of Conduct, and all Director Defendants are subject to the relevant sections of the Company's Code of Conduct as set forth below, which purports to establish the principles of business conduct that Alphabet considers fundamental in its operations worldwide. In particular, the Code of Conduct provides that each officer, director and employee must "do the right thing"—protect assets, data, and personal information, and put the Company interests ahead of their own.

45. Specifically, each officer, director and employee must:

(a) "Avoid Conflicts of Interest";

(b) "Ensure Financial Integrity and Responsibility" for financial records and internal controls;

(c) "Obey the Law," including Trade Law controls for importing and exporting goods, services and technical data, Competition Laws, Insider Trading Laws, and Anti-Bribery Laws; and

(d) Promote a workplace that is supportive and respectful for all Alphabet employees and members.

46. In addition, the Code of Conduct also includes a reference to the Google Code of Conduct, which multiple Directors and Officers are subject to a requirement to conform with Intellectual Property: "You must respect all copyright and other intellectual property laws, including laws governing the fair use of copyrights, trademarks, and brands [including] the intellectual property rights of others. Inappropriate use of others' intellectual property may expose Google and you to criminal and civil fines and penalties. Please seek advice from Legal before you solicit, accept, or use proprietary information from individuals outside the company or let them use or have access to Google proprietary information. You should also check with Legal if developing a product that uses content not belonging to Google."

47. This same Google Code of Conduct also includes a false and misleading statement, which is publicly disclosed on Alphabet's Investor Relations website: "Google is committed to open source software development. Consistent with our policy of respecting the valid intellectual property rights of others, we strictly comply with the license requirements under which open source software is distributed. Failing to do so may lead to legal claims against Google, as well as significant damage to the company's reputation and its standing in the open source community. Please seek guidance from Legal and the Open Source Programs Office before incorporating open source code into any Google product, service, or internal project."

**C. Alphabet's Audit Committee Charter**

48. The Audit Committee Defendants are subject to heightened responsibilities to identify, assess, and mitigate risks associated with the Company's operations.

49. According to the 2026 Proxy, the main function of the Audit Committee is to: (i) oversee Alphabet's accounting and financial reporting processes, oversee Alphabet's relationship with independent auditors; (ii) provide oversight regarding significant financial matters; and (iii) review and discuss with management Alphabet's major risk exposures.

50. The Audit Committee's responsibilities include but are not limited to:

- Overseeing the risks and exposures associated with:
  - Financial matters, including but not limited to financial strategy and reporting, tax, accounting, disclosure, internal control over financial reporting, treasury policies and activities, investment guidelines, and credit and liquidity matters; and
  - Alphabet's operations and infrastructure, particularly reliability, business continuity and capacity.
- Selecting, hiring, compensating, and ongoing monitoring of our independent auditors, and approving the audit and non-audit services they perform.
- Overseeing and monitoring the integrity of our financial statements and our compliance with related legal and regulatory requirements.
- Establishing and overseeing processes and procedures regarding complaints and confidential and anonymous employee submissions about accounting, internal accounting controls, or audit matters.
- Overseeing our internal control function, reviewing the appointment of an internal auditing executive and any significant issues raised by the internal audit team.
- Reviewing with management and the independent auditors our annual audited financial statements, quarterly financial statements, earnings announcements, regulatory filings including our annual proxy statement, and other public announcements regarding our results of operations.
- Reviewing and approving related party transactions.

51. Under the Audit Committee Charter, the Audit Committee Defendants' main responsibility to oversee Alphabet's financial reporting process, which includes:

(a) *Hiring and Selection of Auditors*. The Audit Committee will directly appoint, retain and compensate Alphabet's independent auditors. These independent auditors will report directly to, and be responsible to, the Audit Committee.

(b) *Approval of Audit and Non-Audit Services*. The Audit Committee is responsible for overseeing services provided by the independent auditors, including establishing a policy to decide what services will be performed and the approval requirements for these services.

(c) *Auditor Independence*. The Audit Committee is responsible for making sure it reviews at least annually the qualifications, performance and independence of the auditors. In addition, the Audit Committee shall review a formal written statement explaining all relationships between the outside auditors and Alphabet consistent with the applicable requirements of the Public Company Accounting Oversight Board regarding the independent auditor's communications with the Audit Committee concerning independence. The Audit Committee will maintain an active dialogue with the independent auditors, covering any disclosed relationships or services that may impact their objectivity and independence. The Audit Committee will review all proposed hires by Alphabet or any of its subsidiaries or controlled affiliates of management level or higher individuals formerly employed by the independent auditors who provided services to Alphabet or any of its subsidiaries or controlled affiliates. The Audit Committee will take, or recommend to the Board of Directors that it take, appropriate

actions to oversee the independence of Alphabet's outside auditors.

(d) *Oversight of Auditors; Audit Plan*. The Audit Committee will be responsible for Alphabet's relationship with its independent auditors. The Audit Committee will discuss with the independent auditors the overall scope and plans for their audits and other financial reviews, as well as any other matters that are required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board. The Audit Committee will oversee the rotation of the audit partners of Alphabet's independent auditors as required by the Sarbanes-Oxley Act and the rules of the SEC. The Audit Committee will be responsible for reviewing and resolving any disagreements between Alphabet's management and the independent auditors regarding financial controls or financial reporting.

(e) *Risk Assessment*. The Audit Committee has responsibility for oversight of risks and exposures associated with (1) financial matters, particularly strategy, financial reporting, tax, accounting, disclosure, internal control over financial reporting, treasury policies and activities, investment guidelines and credit and liquidity matters; and (2) our operations and infrastructure, particularly reliability, business continuity, and capacity. In order to facilitate this review, the Audit Committee will meet in executive session with key management personnel and representatives of outside advisors as required.

(f) *Internal Controls*. The Audit Committee will discuss with management and the independent auditors the design,

implementation, adequacy and effectiveness of Alphabet's internal controls. The Audit Committee will also meet separately with the independent auditors, with and without management present, to discuss the results of their examinations. The Audit Committee will provide oversight over the system of internal controls, relying upon management's and the independent auditors' representations and assessments of, and recommendations regarding, these controls. The Audit Committee will review any required disclosures regarding Alphabet's internal controls.

(g) *Internal Audit Processes*. The Audit Committee will review the appointment of an internal auditing executive and the Chair of the Audit Committee will meet separately with such executive at least once every quarter. The Audit Committee will review any significant issues raised in reports to management by the internal audit team. The Audit Committee will also provide oversight of the internal audit department objectives, its mission, responsibilities, independence, performance and annual plan.

(h) *Quarterly and Annual Financial Statements*. The Audit Committee will review and discuss the annual audited and quarterly financial statements with management (including the "Management's Discussion and Analysis" section and officer certifications). The Audit Committee will be responsible for making a recommendation to the Board of Directors as to whether Alphabet's annual audited financial statements should be included in Alphabet's Annual Report on Form 10-K.

(i) *Proxy Report*. The Audit Committee will prepare any report required to be prepared by it for inclusion in any proxy statement of Alphabet under SEC rules and regulations.

(j) *Earnings Announcements*. The Audit Committee will review and discuss with management Alphabet's quarterly earnings announcements and other public announcements regarding Alphabet's results of operations.

(k) *Critical Accounting Policies*. The Audit Committee will obtain, review and discuss reports from the independent auditors about:

a. all critical accounting policies and practices which Alphabet will use, and the qualities of those policies and practices;

b. all alternative treatments of financial information within generally accepted accounting principles that the auditors have discussed with management officials of Alphabet, ramifications of the use of these alternative disclosures and treatments, the treatment preferred by the independent auditors and the reasons for favoring that treatment; and

c. other material written communications between the independent auditors and Alphabet management, such as any management letter or schedule of unadjusted differences.

52. The Audit Committee Defendants are also required to discuss with the independent auditors and then disclose those matters whose disclosure is required by applicable auditing standards, including any critical audit matters, difficulties the independent auditors encountered in the course of the audit work, any restrictions on the scope of the independent auditors' activities or on their access to requested information, and any significant disagreements with management:

(a) *CEO and CFO Certifications*. The Audit Committee will review the CEO and CFO disclosure and certifications under Sections 302 and 906 of the Sarbanes-Oxley Act.

(b) *Related Party Transactions*. The Audit Committee will review and approve all related party transactions.

(c) *Anonymous Complaint Handling Process*. The Audit Committee will have responsibility for establishment and oversight of processes and procedures for (a) the receipt, retention and treatment of complaints about accounting, internal accounting controls or audit matters, and (b) confidential and anonymous submissions by employees concerning questionable accounting, auditing and internal control matters. All such relevant complaints and submissions must be reported to the Audit Committee.

(d) *Ability to Investigate; Retention of Advisors*. The Audit Committee has the power to investigate any matter brought to its attention, with full access to all Alphabet books, records, facilities and employees. The Audit Committee has the sole authority to select, retain and terminate consultants, legal counsel or other advisors to advise the Audit Committee, at the expense of Alphabet, and to approve the terms of any such engagement and the fees of any such consultants, legal counsel or advisors. In selecting a consultant or other advisor, the Audit Committee will take into account factors it considers appropriate or as may be required by applicable law or listing standards.

(e) *Review of Alphabet Policies*. The Audit Committee will be responsible for reviewing and approving all changes to Alphabet's Policy Against Insider Trading, Related Party Transaction Policy,

Investment in Marketable Securities and Accounting for Marketable Securities Policy, Foreign Exchange and Accounting for Foreign Currency Hedges Policy, and Global Commitment and Signature Authority Policy. The Audit Committee will regularly review the implementation and effectiveness of these policies with management and Alphabet's legal team. The Chief Legal Officer has express authority to communicate personally at any time with the Chair of the Audit Committee about these matters.

53. The Audit Committee Defendants are also required to periodically review and discuss with management, Alphabet's overall hedging strategy and the use of swaps and other derivative instruments by Alphabet or any of its subsidiaries for hedging risks pursuant to Alphabet's Investment Policy, other hedging policies, or otherwise.

(a) *Review of Charter*. The Audit Committee will review and reassess the adequacy of this charter at least once a year and make recommendations to the Board regarding any proposed changes.

**D. Breaches of Duties**

54. Defendants' conduct constitutes a knowing and culpable breach of their duties as officers and/or directors of Alphabet, demonstrating a lack of good faith and a reckless disregard for their obligations to the Company, as their actions violated privacy law and they either knew or were reckless in failing to recognize that their actions posed a significant risk of serious harm to the Company.

55. During the Relevant Period,[1] Defendants breached their duty of loyalty and good faith by causing the Company to adopt an unlawful business plan, pursuant to which they caused the Company to violate copyright laws, federal securities laws, BIPA, and to cause, or by themselves causing, the Company to make improper statements to the public

[1] The Relevant Period is January 2023 to the present.

and failing to implement adequate internal controls over legal and regulatory compliance. These improper practices caused Alphabet to incur substantial damages.

56. Defendants, because of their positions of control and authority as officers or directors of Alphabet, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. Defendants also failed to prevent the other Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Alphabet has expended, and will continue to expend, significant sums of money to remedy Defendants' failures.

## V. FACTUAL BACKGROUND

### A. The Alphabet AIs

57. Alphabet's AI models include multiple generative-AI models and related tools and technologies. To train these generative-AI models, Alphabet amassed an enormous library of data that includes copyrighted works and built a suite of commercial voice AI products that includes the voiceprints from the voices of real people, copied without author consent, credit, or compensation. Alphabet's AI models include Google's LLMs, T2I models, and CVMs.

### B. Alphabet's LLMs

58. Alphabet's LLMs are software programs trained by copying an enormous quantity of copyrighted works developed by writers, artists, musicians, sound recordings, musical compositions, and lyrics. These LLMs were trained on multiple pirated datasets and copied copyrighted works multiple times to train Alphabet's and Google's platforms and products.

59. Alphabet's LLMs and T2I models include Bard, Gemini, Imagen, Imagen 2, Lyria, Lyria 2, Lyria 3, MuLan, and MusicLM, which are integrated into multiple Alphabet products that include Google Search, Google Cloud, Gmail, Google Docs, Google Ads, Google Slides, Chrome, YouTube, Google Photos, Google Sheets, Google Meet, Google Pixel, Google Maps, Google AI Studio, Google Vids, Google Workspace,

Google Brain, Vertex AI, SoundStream, Gemini, Dream Track, MusicFX DJ, Music AI Sandbox, and Magenta RealTime.

60. Alphabet and Google trained its LLMs and T2I models based on unlawfully copied copyrighted materials pulled up from multiple pirated datasets, including Z-Library, the LAION-400M dataset, the LAION-5B dataset, the 'img2dataset' that extracted images from LAION-440M, and pulled out sound recordings, musical compositions, and lyrics from YouTube and Magenta.

**i. Alphabet's LLMs Related to Writers and Artists**

61. In May 2022, Alphabet announced through Google that it was setting up its Imagen LLM, which it conceded it had trained through the LAION-400M dataset. In a publicly distributed paper entitled "Photorealistic Text-to-Image Diffusion Models with Deep Language Understanding," Google's researchers disclosed that Imagen's "data requirements of text-to-image models have led researchers to rely heavily on … web-scraped datasets [and] utilized LAION-400M dataset" which contained copyrighted works.

62. In November 2022, Google set up Imagen available to users through the AI Test Kitchen app. As of May 2023, Google made Imagen commercially available through Vertex AI, and described as "Imagen, our text-to-image foundational model [that] lets organizations generate and customize studio-grade images." By October 2023, Google upsurged Imagen into Search Generative Experience, where users can "create … images based on your prompt that you can pick from[, a] tool [that] is powered by the Imagen family of models."

63. This "family of models" was hub flow generated by LAION, an organization based in Hamburg, Germany, and led by Christoph Shuman. LAION's role as a "Large-Scale Artificial Intelligence Open Network" is to "make large-scale machine learning models, datasets and related code available to the general public." LAION's primary datasets are "training images" which it released for LLMs and now are widely used in AI dataset platforms.

64. In August 2021, LAION released LAION-400M, a dataset that infused 400 million "training images" accessed on the public internet and made available for public access. Romain Beamont, a primary LAION team member, then created an online tool, "Clip Retrieval," to provide a search interface to determine whether certain artists or artwork included in LAION-400M. Beaumont also authored a paper that publicly introduced LAION-400M, "LAION-400M: Open Dataset of CLIP-Filtered 400 Million Image-Text Pairs," disclosed in November 2021. This paper essentially conceded LAION's illegal use of "400 million image text pairs":[2]

> [W]e build and release LAION-400M, a dataset with CLIP-filtered 400 million image-text pairs, their CLIP embeddings and kNN indices. We describe the procedure to create the dataset and demonstrate successful training of DALL-E architecture. Having sufficiently large scale, the dataset opens venues for research on multi-modal language-vision models to broad community.
>
> *****
>
> We officially release the following packages under LAION-400M project:
>
> - 400 million pairs of image URL and the corresponding metadata
> - 400 million pairs of CLIP image embedding and the corresponding text
> - Several sets of kNN indices that enable quick search in the dataset
> - img2dataset library that enables efficient crawling and processing of hundreds of millions of images and their metadata from a list of URLs with minimal resources
> - Webdemoof image-text search on LAION-400M
>
> *****
>
> To create image-text pairs, we parse through WAT files from Common Crawl and parse out all HTML IMG tags containing an alt-text attribute. We download the raw images from the parsed URLs with asynchronous requests using Trio and Asks libraries.
>
> *****

[2] Romain Beaument, *et al.*, *LAION-400M: Open Dataset of CLIP-Filtered 400 Million Image-Text Pairs*, arXiv:2111.02114v1 (Nov. 3, 2021).

> We developed img2dataset library to comfortably download from a given set of URLs, resize and store the images and captions in the webdataset format.3 This allows to download 100 million images from our list of URLs in 20 hours with a single node (1Gbps connection speed, 32GB of RAM, an i7 CPU with 16 cores), which allows anyone to obtain the whole dataset or a smaller subset.
>
> *****
>
> By releasing an openly available dataset that contains 400 million image-text pairs, we have closed the gap to proprietary large scale datasets that were necessary to train state-of-the-art language-vision models such as DALL-E and CLIP. As proof of concept, we demonstrated that a subset of our dataset can be used to train a DALL-E model, producing samples of sufficient quality. The dataset opens the road for large-scale training and research of language-vision models, that were previously restricted to those having access to proprietary large datasets, to the broad community.

65. Downloading the LAION-400M dataset provides access to metadata records, one for each training image. To facilitate any copying of these images, Beaumont created the img2dataset, which takes the LAION-400M metadata records as input to set up copies of the referenced imaged from the URLs in each metadata record to create the local copies. The img2dataset was distributed onto GitHub. To train Imagen with the LAION-400M dataset, Google necessarily utilized the img2datset which contained copyrighted works that were infringed.

66. Beaumont also conceded that LAION set up LAION-400M by starting with Common Crawl, which is also essentially a piracy dataset contained in The Pile. The Pile includes the Books3 dataset, consisting of approximately 196,640 books sourced from the online pirate "shadow library" Bibliotek. The Pile is a dataset articulated in a paper by EluetherAI called "The Pile: An 800GB Dataset of Diverse Text for Language Modeling," which described the Books3 as "a dataset of books derived from a copy of the contents of the Bibliotik private tracker … Bibliotik consists of a mix of fiction and nonfiction books and is almost an order of magnitude larger than our next largest book dataset (BookCorpus2). We included Bibliotik because books are invaluable for long-range context modeling research and coherent storytelling."

67. Bibliotek is well known as a notorious pirate website that contains vast quantities of unauthorized copyright materials used to train AI language models. Utilizing these illegal libraries provided LAION and other AI entities with access to large quantities of training data rapidly. Such pirate libraries are in violation of the Copyright Act, and the AI developers' use of such materials to train AI models is not shielded by the fair use doctrine.

68. On March 20, 2025, the Danish Rights Alliance issued a report that articulated "'Classic pirate sources' are widely used to train AI datasets."[3] "Generative AI model providers across the spectrum of LLMs, image, video and music generation (platforms) have obtained infringing copies of copyright protected works that were sourced from 'classic pirate sources' such as illegal filesharing and streaming sites."[4] The report also describes how generative AI developers, obtain piracy datasets from Books3 and Common Crawl. The Danish Rights Alliance Report also articulated that the Books3 and Common Crawl datasets with copyright infringement were contained in the Pile.[5]

69. Alphabet, through Google, hired Beaumont in March 2022 to infuse the creation of future LAION image datasets, which would include LAION-5B, a dataset with 5.85 billion training images. In August 2022, Beaumont created a specialized AI model to create subsets from LAION-5B, called LAION-Aesthetics, which formed the basis of Imagen 2. Beaumont authored a paper that described this interaction that resulted in copyright infringement for Google, "LAION-5B: An open large scale dataset for training the next generation image-text models." The img2data was also set up to infuse metadata records from LAION-5B to create access to local copies.

---

[3] Available at: https://piracymonitor.org/report-classic-pirate-sources-are-widely-used-to-train-ai-datasets-says-danish-rights-alliance/.

[4] *Id.*

[5] *Id.*

70. Google launched Bard in 2023, developed using an LLM named LaMDA. LaMDA was developed on Google's "Infiniset Dataset" that incorporated the C4 dataset. The C4, based on development in 2020, was filtered into the "Common Crawl" dataset. C4 was used to train the Gemini LLM based on copyrighted material from the Z-Library. C4 is thus a vector for copyright infringement, because it contains a huge collection of copyrighted materials. C4 is infused with data from "b-ok.org," also known as Z-Library, is a "notorious market for pirated e-books" as discussed in a news article "Inside the secret list of websites that make AI like ChatGPT sound smart":[6]

> [W]e analyzed Google's C4 data set, a massive snapshot of the contents of 15 million websites that have been used to instruct some high-profile English-language AIs, called large language models, including Google's T5 and Facebook's LLaMA.
>
> *****
>
> The data set was dominated by websites from industries including journalism, entertainment, software development, medicine and content creation, helping to explain why these fields may be threatened by the new wave of artificial intelligence. The three biggest sites were patents.google.com, which contains text from patents issued around the world; wikipedia.org, the free online encyclopedia; and scribd.com, a subscription-only digital library. Also high on the list: b-ok.org, a notorious market for pirated e-books that has since been seized by the U.S. Justice Department. At least 27 other sites identified by the U.S. government as markets for piracy and counterfeits were present in the data set.
>
> *****
>
> The Post's analysis suggests more legal challenges may be on the way: The copyright symbol — which denotes a work registered as intellectual property — appears more than 200 million times in the C4 data set.
>
> *****
>
> Technology is the second largest category, making up 15 percent of categorized tokens. This includes many platforms for building websites,

[6] Kevin Schaul, *et al.*, *Inside the Secret List of Websites that Make AI Like ChatGPT Sound Smart*, WASH. POST (Apr. 19, 2023).

> like sites.google.com, which hosts pages for everything from a Judo club in Reading England to a Catholic preschool in New Jersey.
>
> ******
>
> Tech giants like Facebook and Google that are sitting on mammoth troves of conversational data have not been clear about how personal user information may be used to train AI models that are used internally or sold as products.
>
> *****
>
> Like most companies, Google heavily filtered the data before feeding it to the AI. (C4 stands for Colossal Clean Crawled Corpus.). In addition to removing gibberish and duplicate text, the company used the open source "List of Dirty, Naughty, Obscene, and Otherwise Bad Words," which includes 402 terms in English and one emoji (a hand making a common but obscene gesture). Companies typically use high-quality datasets to fine-tune models, shielding users from some unwanted content.
>
> *****
>
> A web crawl may sound like a copy of the entire internet, but it's just a snapshot, capturing content from a sampling of webpages at a particular moment in time. C4 began as a scrape performed in April 2019 by the nonprofit CommonCrawl, a popular resource for AI models. CommonCrawl told The Post that it tries to prioritize the most important and reputable sites, but does not try to avoid licensed or copyrighted content.
>
> *****
>
> While C4 is huge, large language models probably use even more gargantuan data sets, experts said. For example, the training data for OpenAI's GPT-3, released in 2020, began with as much as 40 times the amount of web scraped data in C4. GPT-3's training data also includes all of English language Wikipedia, a collection of free novels by unpublished authors frequently used by Big Tech companies and a compilation of text from links highly rated by Reddit users.

71. The Infiniset that encompassed C4 is a dataset used to train Bard, Gemini's predecessor. Bard and C4 where then essentially utilized to train Gemini.

72. The Defendants are well aware that Alphabet, through Google, engaged in training datasets that were copied, including LAION-400M and C4, which contained

copyrighted works. The Defendants are also well aware of the legal risks associated with Google's use of copyrighted works in training its AI models.

73. Defendants made a false and misleading statement related to these AI platforms on January 31, 2024, when Alphabet filed its annual report on Form 10-K, regarding products based on the Company's AI platforms that Defendants falsely contend were "responsible AI with models":

> ***Deliver the Most Advanced, Safe, and Responsible AI***
>
> We aim to build the most advanced, safe, and responsible AI with models that are developed, trained, and rigorously tested at scale powered by our continued investment in AI technical infrastructure. In December 2023, we launched Gemini, our most capable and general model. It was built from the ground up to be multimodal, ***which means it can generalize and seamlessly understand, operate across, and combine different types of information, including text, code, audio, images, and video. Our teams across Alphabet will leverage Gemini, as well as other AI models we have previously developed and announced, across our business to deliver the best product and service experiences for our users, advertisers, partners, customers, and developers***.
>
> ***We believe our approach to AI must be both bold and responsible. That means developing AI in a way that maximizes the positive benefits to society while addressing the challenges, guided by our AI Principles***. We published these in 2018, as one of the first companies to articulate principles that put beneficial use, users, safety, and avoidance of harms above business considerations. While there is natural tension between being bold and being responsible, we believe it is possible — and in fact critical — to embrace that tension productively.

**ii. Alphabet's LLMs Related to Musicians**

74. Alphabet and Google have engaged in copying millions of copyrighted sound recordings, musical compositions, and lyrics. Google ingested, copied, processed, and commercially exploited these works without permission or compensation. These copies were used to build Lyria, Lyria 2, Lyria 3, Mulan, and MusicLM.

75. Alphabet owns and operates YouTube. YouTube is one of the most important platforms for music discovery, distribution, and monetization, which contain its right-management system, Content ID. YouTube's database contains millions of

referenced files, which include full length audio recordings by copyright holders and identify "the artist, the rights owner, and the territories of ownership." Contend ID purportedly ensures copyright holders that YouTube will prevent unauthorized distribution of their music. Google undermined YouTube's Contend ID statement of position for the benefit of copyright holders by ingesting these copyrighted acts from YouTube without copyright holder consent.

76. Google pulled out and dismantled these recordings by extracting audio into training datasets, converted them into machine-readable formats, then modified them into clips and tokenized into computational representations for reuse in training, fine-tuning, and subsequent product iterations. Google also stripped out all copyright information that identified the artists and their copyright notices. Google undertook this process without permission from, or compensation to, all copyright holders.

77. Alphabet, through Google, undertook this process beginning in 2016, when Alphabet was first publicly established through its Initial Public Offering ("IPO"). Google launched the Magenta project that showed Google was investing in music generation. As described in its published work, "Welcome to Magenta!", Google disclosed the conversion of audio recordings into numerical tokens and described how the language models are trained to predict and produce token sequences for LLMs which users can utilize to request music by describing a genre, mood, instrument, or style.[7]

78. Google disclosed SoundStream in 2021, a neural audio codec designed to compress speech, music, and general audio to be converted into a model that can learn from, store, and reproduce into audio form. Google then disclosed AudioLM in 2022, generated by training transformer models that trained language models. AudioLM combined semantic token to capture musical structure that included melody, harmony, and rhythm with acoustic tokens produced by SoundStream.

---

[7] Eck, Douglas, *Welcome to Magenta!*, Magenta Blog, June 1, 2016.

79. In October 2022, Google publicly introduced MuLan, a joint music-text embedding model to directly align a user's words, genres, moods, instruments, eras, artists, and other descriptive language with the sound of recorded music.[8] This training corpus included approximately 50 million internet music videos, extracted into audio clips. Google reported using video titles and tags, video descriptions and comments, and playlist titles from 171 million paylists linked to music videos. Google described using MuLan embeddings from audio during training, which provided Google with the ability to train its music generators on enormous collections of recorded music supposedly without any requirement to assert permission-based, caption datasets that included copyrighted audio.

80. In January 2023, Google introduced MusicLM, a text-to-music LLM generator that was capable of producing high-fidelity music. MusicLM's semantic and acoustic modeling stages were trained on a dataset of five million audio clips totaling 280,000 hours of music. Google did not identify the specific recordings, rights holders, or licenses in this 280,000-hour training corpus.

81. In November 2023, Google publicly introduced Lyria, to be "in partnership with YouTube" (https://deepmind.google/models/lyria/). Lyria's output was high-quality music with instruments and vocals. In February 2026, Google launched Lyria 3, which generated short-form music tracks and produces a finished audio clip with vocals, lyrics, instrumentals, harmonies, and backing vocals combined. Lyria 3 is capable of generating "realistic, natural, and nuanced" human voices, and original lyrics from prompts, subject to copyrighted recordings.[9] Google's Lyria 3 model card confirms that Lyria 3 "was trained on audio data," but does not identify the copyrighted recordings. Google has yet to disclose whose music is in the Lyric training data.

---

[8] Huang, Qingqing, *MuLan: A Joint Embedding of Music Audio and Natural Language*, ArXiv, Aug. 26, 2022.

[9] Yawili, Joel, *A new way to express yourself: Gemini can now create music*, Google Blog, Feb. 18, 2026; https://deepmind.google/models/lyria.

82. Each of these LLMs were drawn from YouTube videos. Google targets YouTube as a scalable source for audio extraction.

83. In January 2024, a Billboard article reported that Google had trained its music model on a large set of music, including copyrighted major-label recordings.[10] Google did subsequently reach out to certain rights holders to seek permission, but only the largest and most sophisticated players in the industry and not individual copyright holders. Regardless, Google had already disadvantaged rights holder because it "had already taken what it wanted."

84. In April 2024, the *New York Times* published an article that reported Google and OpenAI had pulled audio from YouTube videos to train its AI models: "How Tech Giants Cut Corners to Harvest Data for A.I."[11] This is material information that Google employees disclosed, and also recognized in 2024 that Google's training practices on YouTube content were comparable to scraping practices that Alphabet could not establish to conform with legal obligations:

> OpenAI researchers created a speech recognition tool called Whisper. It could transcribe the audio from YouTube videos, yielding new conversational text that would make an A.I. system smarter.
>
> Some OpenAI employees discussed how such a move might go against YouTube's rules, three people with knowledge of the conversations said. YouTube, which is owned by Google, prohibits use of its videos for applications that are "independent" of the video platform.
>
> Ultimately, an OpenAI team transcribed more than one million hours of YouTube videos, the people said. The team included Greg Brockman, OpenAI's president, who personally helped collect the videos, two of the people said. The texts were then fed into a system called GPT-4, which was widely considered one of the world's most powerful A.I. models and was the basis of the latest version of the ChatGPT chatbot.

---

[10] Leight, Elias, *Google Trained AI On Copyrighted Music, Sources Say – Now It's Trying to Make Deals*, Billboard, Jan. 25, 2024.

[11] Metz, Cade, et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, The New York Times, Apr. 6, 2024.

The race to lead A.I. has become a desperate hunt for the digital data needed to advance the technology. To obtain that data, tech companies including OpenAI, Google and Meta have cut corners, ignored corporate policies and debated bending the law, according to an examination by The New York Times.

*****

Like OpenAI, Google transcribed YouTube videos to harvest text for its A.I. models, five people with knowledge of the company's practices said. ***That potentially violated the copyrights to the videos, which belong to their creators***.

Last year, Google also broadened its terms of service. One motivation for the change, according to members of the company's privacy team and an internal message viewed by The Times, was to allow Google to be able to tap publicly available Google Docs, restaurant reviews on Google Maps and other online material for more of its A.I. products.

*****

Google and Meta, which have billions of users who produce search queries and social media posts every day, were largely limited by privacy laws and their own policies from drawing on much of that content for A.I.

Their situation is urgent. Tech companies could run through the high-quality data on the internet as soon as 2026, according to Epoch, a research institute. The companies are using the data faster than it is being produced.

*****

Google's rules allowed it to tap YouTube user data to develop new features for the video platform. But it was unclear whether Google could use YouTube data to build a commercial service beyond the video platform, such as a chatbot.

*****

In June, Google's legal department asked the privacy team to draft language to broaden what the company could use consumer data for, according to two members of the privacy team and an internal message viewed by The Times. The employees were told Google wanted to use people's publicly available content in Google Docs, Google Sheets and related apps for an array of A.I. products. The employees said they didn't know if the company had previously trained A.I. on such data.

At the time, Google's privacy policy said the company could use publicly available information only to "help train Google's language models and build features like Google Translate."

85. Significantly, when Google announced Lyria, it credited four researchers as core contributors, all of whom subsequently left Google to form and public launch Udio. As with Google, these four researchers established Udio's AI music-generation trained on copyrighted recordings without authorization. In June 2024, the Recording Industry Association of America sued Udio for copyrighted infringement for essentially the same illegal actions Alphabet had undertaken to set up its LLMs with copyrighted works. Alphabet, via Google, launched Lyria 2 while that action was pending.

86. Alphabet, via Google, extracted audio from YouTube-hosted recordings for use of its LLM development. Google did so within its own infrastructure and with access to the metadata and rights signals that accompany copyrighted uploads. Alphabet has not disclosed that its LLMs were built on copyrighted works, and there is no public evidence that any artist endorsed, authorized, or was compensated for the output.

**C. Alphabet's CVMs**

87. Alphabet's CVMs include Gemini Live, NotebookLM Audio Overviews, Youtube auto-dubbing, Google Cloud Text-to-Speech, and Google Assistant. Voiceprints include those from broadcast journalists, investigative podcasters, and audiobook narrators.

88. Alphabet monetizes CVMs through a vertically integrated commercial chain spanning Google Cloud, Google Workspace, Google's consumer products, Google's hardware, and Alphabet's broader commercial footprint. The voice characteristics learned during training, the same characteristics extracted from voiceprint human voice recordings.

89. Alphabets CVMs are developed, deployed, and served across Google Cloud infrastructure that spans multiple Google Cloud regions and multiple data center facilities. The infrastructure is operated by, or on behalf of, Google through multiple Alphabet subsidiaries and contracted service providers. Google Assistant, Gemini, Gemini Live, and NotebookLM each operate as channels for Google's advertising business. Each of these products depends on the voice AI capabilities built on the foundational models. Advertising revenue derived from these products is, in part, revenue made possible by the voice synthesis technology Google built using human voice voiceprints.

90. Alphabet has also established through Google two other voice-cloning products, Custom Voice and Chirp 3 Instant Custom Voice, which are set up for consent infrastructure, which requires each speaker to record a consent statement affirming: "I am the owner of this voice, and I consent to Google using this voice to create synthetic voice model." These are the sole platforms set up for "Responsible AI governance review," but these consent demand requirements have no business connection to Alphabet's CVMs, which establish the pre-trained foundational models with hundreds of thousands of hours of speech not subject to consent. And the voiceprints Alphabet through Google extracted from the consumer voiceprints stored on these CVMs cannot be deleted on request because they are encoded in parameters and then reproduced in audio generated by the CVMs. Alphabet has extracted consumer voiceprints through these CVMs without notice or consent, which establishes liability for BIPA claims based on unlawful collection, retention, commercial exploitation, dissemination, and failure to protect from commercial voiceprint disclosure without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users.

91. Google Cloud Text-to-Speech is Alphabet's initial CVM, launched in June 2018. In 2018, "Google Scholars," Yingzhen Li and Stephan Mandt, described how Alphabet's voice models learned during training are used to "convert speaker identities into each other":[12]

> Our deep generative model learns a latent representation of the data which is split into a static and dynamic part, allowing us to approximately disentangle latent time-dependent features (dynamics) from features which are pre-served over time (content). This architecture gives us partial control over generating content and dynamics by conditioning on either one of these sets of features. In our experiments on artificially generated cartoon video clips and voice recordings, we show that we can convert the content of a given sequence into another one by such content swapping. For audio, this allows us to convert a male speaker into a female speaker and vice versa, while for video we can separately manipulate shapes and dynamics.

[12] Yingzhen Li & Stephan Mandt, *Disentangled Sequential Autoencoder*, https://arxiv.org/abs/1803.02991

> *****
>
> We can generate random dynamics for fixed content, and random content for fixed dynamics. This gives us a controlled way of manipulating a video/audio sequence, such as swapping the identity of moving objects or the voice of a speaker.
>
> *****
>
> Our disentangled representation allows us to convert speaker identities into each other while conditioning on the content of the speech. We also show that our model gives rise to speaker verification, where we outperform a recent probabilistic baseline model …. The goal here is to convert male voice to female voice (and vice versa) with the speech content being preserved.
>
> ****
>
> We provide sound files to demonstrate the conversion of female/male speech sequences at … drive.google.com.

92. NotebookLM Audio Overviews was launched in September 2024. In October 2024, through Google DeepMind, Alphabet published a blog post entitled "Pushing the frontiers of audio generation," which referenced Alphabet's CVMs, including NotebookLM Audio Overviews:[13]

> For years, we've been investing in audio generation research and exploring new ways for generating more natural dialogue in our products and experimental tools …. AudioLM treats audio generation as a language modeling task to produce the acoustic tokens of codecs like SoundStream …. Building upon this research, our latest speech generation technology can produce 2 minutes of dialogue, with improved naturalness, speaker consistency and acoustic quality, when given a script of dialogue and speaker turn markers …. The tokens produced by our codec have a hierarchical structure and are grouped by time frames. The first tokens within a group capture phonetic and prosodic information, while the last tokens encode fine acoustic details …. To teach our model how to generate realistic exchanges between multiple speakers, we pretrained it on hundreds of thousands of hours of speech data. Then we finetuned it on a much smaller dataset of dialogue with high acoustic quality and precise speaker annotations, consisting of unscripted conversations from a number of voice actors and disfluencies – the "umm"s and "ahh"s of real conversation. This step taught the model how to reliably switch between speakers during a generated dialogue and to output only studio quality audio with realistic pauses, tone and timing.

[13] Zalán Borsos et al., *Pushing the frontiers of audio generation*, Google DeepMind (Oct. 30, 2024), https://deepmind.google/discover/blog/pushing-the-frontiers-of-audio-generation/

93. This blog established that Alphabet obtained substantial portions of its voice training data from publicly assessable internet sources without voiceprint speaker consent, and underscores that Alphabet and Google did not previously have any contractual basis for training on YouTube. The blog recognized this and publicly disclosed it. The voiceprint speakers' voices appeared in YouTube content uploaded by other parties, without any ability for voiceprint speakers to have contractual control.

94. In December 2024, Alphabet introduced opt-in controls allowing YouTube creators to prevent third-party AI companies from training on their uploads, which do not apply to Google's own use of YouTube content. Alphabet has not published, and does not maintain, any opt-out or removal mechanism for speakers whose voices appear in audio ingested into Google's foundational voice synthesis models.

**D. Red Flags of Alphabet's Copyright Infringement and BIPA Violations**

95. Defendants were well aware of the potential liability stemming from Alphabet's unauthorized use of copyrighted works and voiceprints in developing Alphabet's Google LLMs and CVMs.

96. First, all the Officer Defendants were personally involved in: (i) the development of Alphabet's AI strategy and the details of LAION-400M and C4 used to develop Google's LLMs and AI products instead of other commercially available dataset platforms that did not include copyrighted materials; (ii) the dissemination of copyrighted sound recordings from YouTube to establish commercial music LLM generators; and (iii) the utilization of Alphabet's CVMs, primarily Gemini Live, NotebookLM Audio Overviews, YouTube auto-dubbing, Google Cloud Text-to-Speech, and Google Assistant, which ingested hundreds of thousands of human speech recordings, extracted unique biometric signatures and voiceprints, and failed for Alphabet to provide any notice to, or release from, any of the speakers whose recordings were placed on the training pipeline. The Director Defendants were made aware of the Officer Defendants' engagement in this copyright infringement and BIPA violation process.

97. Second, the multiple individual and class action lawsuits against other AI developers for copyright infringement and BIPA violations put all Defendants on notice of the need to avoid using unlicensed copyright and voiceprint materials in LLMs and CVMs used to train Google's AI models. Multiple class actions filed beginning in 2023 involve claims against Alphabet's competitors based on the exact same approach to Defendants' construction of an AI training database premised on multiple "shadow libraries," including The Pile, Books3, Anna's Archive, RedPajama, LibGen, SciHub, Z-Library, and Panda-70M, datasets comprised of YouTube videos, and human speech recordings.

98. Defendants knew or recklessly disregarded this vortex of litigation targeting AI developers, all of which was widely reported. The first action filed against Anthropic in 2023, *Concord I*, alleged that Anthropic "torrented 'countless pirated copies' of songbooks and sheet music."[14] Anthropic "used BitTorrent to download publishers' works" and "simultaneously uploaded to the public large unauthorized copies of the same works, separately violating publishers' exclusive right of distribution and encouraging further infringement of their copyrighted works."[15]

99. Defendants were also on notice of the widely reported resolution of the *Concord I* case, for which Anthropic paid damages of $1.5 ***billion*** to resolve after Judge Alsup on June 23, 2025, issued a summary judgment Order on Fair Use establishing Anthropic's potential liability for the "Pirated Library Copies." The Court "denie[d] summary judgment for Anthropic that the pirated library copies must be treated as training copies," and set up a "trial on the pirated copies used to create Anthropic's central library and the resulting damages, actual or statutory (including for willfulness)." *Concord I*, No. 3:24-cv-05417-WHA (N.D. Cal.) (ECF No. 231 at 31-32).

---

[14] Hailey Konnath, *Anthropic Hit With 2nd Music IP Suit, This Time for $3B*, LAW360 (Jan. 28, 2026); available at: https://www.law360.com/articles/2435463/.

[15] *Id.*

100. Defendants were also well aware of the potential liability for Alphabet's unauthorized utilization of copyright infringement based on the additional multiple individual and class action lawsuits against other corporations for copyright infringements relating to AI platforms, including: *Kadrey v. Meta Platforms, Inc*, No. 3:23-cv-3417-VC (N.D. Cal. 2023); *Bartz v. Anthropic PBC*, No. 4:24-cv-05417-AMO (N.D. Cal. 2024); *UMG Recordings, Inc. v. Uncharted Labs, Inc.*, No. 1-24-cv-04777-AKH (S.D.N.Y. 2024); *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-VC-FDS (D. Mass. 2024); *Hendrix v. Apple Inc.*, No. 4:25-cv-07558-YGR (N.D. Cal. 2025); *Lyon v. Adobe Inc.*, No. 3:25-cv-10732-JSC (N.D. Cal. 2025); *James v. Snowflake Inc.*, No. 2:25-cv-00108-BMM (D. Mont. 2025); *Tanzer v. Salesforce Inc.*, No. 3:25-cv-08862-CRB (N.D. Cal. 2025); *Bird v. Microsoft Corp.*, No. 1:25-cv-05282 (S.D.N.Y. 2025); *Ted Entertainment, Inc. v. OpenAI, Inc.*, No. 5:26-cv-02935-BLF (N.D. Cal. 2026); *Kleiner v. Adobe Inc.*, No. 3:26-cv-01218-JSC (N.D. Cal. 2026); *Nazemian v. NVIDIA Corp.*, No. 4:24-cv-01454-JST (N.D. Cal. 2024); and *Ted Entertainment, Inc. v. Amazon.com, Inc.*, 2:26-cv-01134 (W.D. Wash. 2026).

101. Defendants were also well aware of the potential liability for Alphabet's BIPA violations based on the additional multiple individual and class action lawsuits against other corporations for BIPA claims relating to AI platforms. In 2015, a BIPA action was filed against Facebook, which ultimately settled for $650 million as of 2020, *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-0374-JD (N.D. Cal. 2015). In 2020, a BIPA action was filed against TikTok, which ultimately settled for $92 million as of 2025, *In re TikTok, Inc. Consumer Privacy Litig.*, MDL No. 2948 (N.D. Ill. 2020). Multiple BIPA lawsuits were also filed in accord with the BIPA lawsuit filed against Alphabet, including: *Basich v. Microsoft Corp.*, No. 2:26-cv-00422 (W.D. Wash. 2026); *Amer v. Eleven Labs Inc.*, No. 1:26-cv-05437 (N.D. Ill. 2026); *Rogers v. NVIDIA Corp.*, No. 1:26-cv-05478 (N.D. Ill. 2026); *Marin v. Meta Platforms, Inc.*, No. 1:26-cv-05438 (N.D. Ill. 2026); *Delgado v. Meta Platforms, Inc.*, No. 3:23-cv-04181-SI (N.D. Cal.

2023); *Lacour v. Apple Inc.*, No. 1:26-cv-05536 (N.D. Ill. 2026); *Dorcus v. Adobe Inc.*, No. 1:26-cv-05575 (N.D. Ill. 2026), and *Flowers v. Microsoft Corp.*, No. 1:26-cv-05491 (N.D. Ill. 2026).

### E. The Copyright Infringement and BIPA Class Actions Against Alphabet and Google

102. On July 11, 2023, copyrighted works holders filed their class action lawsuit against Alphabet and Google, *Leovy v. Google LLC*, No. 23-cv-03440 (N.D. Cal. 2023). On April 26, 2024, copyrighted works holders filed their class action lawsuit against Alphabet and Google, *Zhang v. Google LLC*, No. 24-cv-02531 (N.D. Cal. 2024). These two actions were consolidated, and on December 20, 2024, these copyright work holders filed a consolidated amended complaint, in the action captioned and entitled *In re Google Generative AI Copyright Litigation*, No. 23-cv-03440-EKL (N.D. Cal. 2024). The complaint alleged:

> Google willfully infringed millions of registered copyrighted works to create its commercial artificial-intelligence ("AI") business. Plaintiffs are visual artists and authors who have copyright registrations for certain works (including the "Plaintiff Works" cited herein). Google willfully copied the Plaintiff Works without authorization to build and train its generative artificial intelligence models ("Generative AI Models"), including Gemini2 and Imagen,3 thereby violating 17 U.S.C. § 501.
>
> The scale of Google's copyright infringement is unprecedented. To build its Generative AI Models, Google copied millions of copyrighted works and permanently embedded copies of these works within these models. For example, Google's training dataset for its Bard model comprised 1.56 trillion words.4 Similarly, LAION-5B—a likely training dataset for Imagen—comprises 5.8 billion image-caption pairs. The training of a Generative AI Model necessarily involves making multiple unauthorized copies of each work. For each work used in training, first a copy is made during data collection, then a series of copies are made during model training, and finally a copy is permanently incorporated into the parameters of the Generative AI Model.
>
> Google's unauthorized copying of the Plaintiff Works continues to harm Plaintiffs through Google's ongoing monetization of those works. Google is integrating its Generative AI Models into a growing set of Google products, thereby powering them with infringing copies of the Plaintiff Works. Those products include Google Search, Google Cloud, Gmail,

> Google Docs, Google Ads, Google Slides, Chrome, YouTube, Google Photos, Google Sheets, Google Meet, Google Pixel, Google Maps, Google AI Studio, Google Vids, Google Workspace, and Vertex AI (collectively, the "AI-Powered Products"). Google was able to create the AI-Powered Products because of the Generative AI Models it built and trained on Plaintiffs' copyrighted works without Plaintiffs' license or authorization.
>
> By embedding the Plaintiff Works into its Generative AI Models, Google has irreversibly entangled the Plaintiff Works with its commercial products. Google has stripped Plaintiffs of their exclusive rights under the Copyright Act to control the copying and distribution of the Plaintiff Works. This unauthorized copying and distribution inflicts immediate and irreparable harm on Plaintiffs—harm that Google compounds daily through its expanding deployment of AI-Powered Products built on infringed Plaintiff Works.

103. On September 11, 2025, the Court in the *Google Generative AI Copyright* action filed an order partially denying Google's motion to dismiss the consolidated amended complaint. The Court held that the plaintiffs "plausibly alleged copyright infringement as to the following models: PaLM, GLaM, LaMDA, Bard, Gemini, and Imagen" and "identified specific copyrighted works that were allegedly included in datasets used to train these models."

104. On March 6, 2026, copyrighted sound recording musicians filed a class action lawsuit against Google, *Kogon v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill. 2026). The complaint alleged:

> Over years and across successive products, Google copied millions of copyrighted sound recordings, musical compositions, and lyric, including at least 44 million clips and 280,000 hours of music documented in Google's own published research, with the actual training data, on information and belief, substantially larger, stripped away the identifying information that marked those works as someone's property, fed them into a training pipeline, and commercialized the result as Lyria 3, a commercial music generator embedded in a product ecosystem with 750 million users that performs the same creative function as the artists whose work it consumed, in the same markets where those artists earn their livelihoods, at a scale no individual creator can match.
>
> *****
>
> Google documented the scale of what it took without permission, consent, or compensation. In its 2022 MuLan paper, Google researchers described gathering about 50 million internet music videos, extracting 30-second audio clips from each, and keeping roughly 44 million clips after filtering,

representing nearly 370,000 hours of recorded music. In its 2023 MusicLM paper, Google explained training on five million audio clips totaling 280,000 hours. Both papers were published in peer-reviewed venues under the names of Google researchers. Neither mentions a license. Neither discusses a consent mechanism. Neither identifies a single rights holder whose permission was sought.

Google knew these practices created legal risk before it released any product to the public. When Google finished MusicLM in early 2023, it initially withheld the model from public release while acknowledging concerns about cultural appropriation and misappropriation of creative content. Four months later, Google released MusicLM through its AI Test Kitchen anyway, inviting consumer feedback to improve the model. On information and belief, Google later shelved another internal music tool, "Orca," due to copyright and legal concerns, and then proceeded with Lyria 3.

Google's response to the legal risk was not to secure rights across the board before training. Instead, Google built Lyria on larger datasets and deployed it at a bigger scale, without resolving the licensing issue it had already identified. In January 2024, Billboard reported, citing four independent sources with direct knowledge of label negotiations, that Google had already trained on copyrighted major-label recordings before reaching out to rights holders. If that is how Google handled the biggest and most sophisticated players in the industry, independent artists had even less visibility, leverage, or protection.

Google didn't just have access to Plaintiffs' music; it operated the infrastructure through which much of that music reached the world. Google owns YouTube, one of the most important platforms for music discovery, distribution, and monetization, and it runs Content ID, YouTube's rights-management system.[15] Its database contains over 50 million reference files: full-length audio recordings provided by rights holders, including metadata identifying the artist, the rights owner, and the territories of ownership. Content ID works because artists and labels entrusted Google with these recordings and metadata to prevent unauthorized distribution of their music. Google accepted that trust, stored the content, and cataloged those works. On information and belief, Google then used the same infrastructure as a source for training a product designed to replace the music it was entrusted to protect.

Google's training pipeline did not merely copy recordings. It dismantled them. On information and belief, Google's pipeline extracted audio into internal systems, converted it to machine-readable formats, segmented it into clips, tokenized it into computational representations for reuse in training, evaluation, fine-tuning, and subsequent product iterations, and in the process, stripped the copyright management information ("CMI") that identified each work: the artist name, the track title, the ISRC code, the copyright notice, the ownership metadata. The expressive content was retained. The information

identifying whose property it was, the information that enables licensing, attribution, and enforcement, was discarded. The point of that process was not passive storage. It was to extract musical value from existing works and redeploy that value in a commercial music generator.

Lyria 3, the model Google launched just weeks ago, doesn't just create generic instrumental beds. Google advertises that it can generate vocals, lyrics, harmonies, and backing vocals, including "realistic, natural, and nuanced" human voices with adjustable qualities. Training a system to produce realistic, customizable vocal performances required Google to model specific vocal traits found in the recordings used for training. Google's privacy materials for ProducerAI acknowledge that voice-based features may involve extracting a biometric voiceprint from a vocal recording.[19] This case, therefore, involves not only copied compositions and sound recordings but also Google's use of human vocal identity.

Google;s public statements about Lyria 3's training data are notable for what they do not say. Google has stated it was "very mindful of copyright and partner agreements." It has not named any agreement. It has not specified a single license covering training data. It has not explained any process by which an artist could have consented, objected, or opted out. Google also claimed that Lyria 3 is "designed for original expression, not for mimicking existing artists," and that it has "filters in place to check outputs against existing content." In the same breath, Google acknowledged that its approach "might not be foolproof." Google has not reconciled its marketing language with the extent and method of copying described in its published research. Google marketed a system built on copyrighted works as responsibly sourced and designed for original expression.

On information and belief, Plaintiffs' copyrighted recordings, compositions, and lyrics are among the works that Google ingested, copied, processed, and commercially exploited without permission or compensation. Google's published papers describe training on datasets derived from tens of millions of internet music videos, the same type of content that Plaintiffs distribute commercially on YouTube and other major platforms. Google has not disclosed any mechanism to exclude specific artists' work from its pipeline, nor has it identified any filter that could have done so.

On information and belief, Google's pipeline copied Plaintiffs' works in their entirety, converted audio recordings and lyric text into machine-readable representations, and retained those representations, along with all derivative computational artifacts, for repeated use in training, fine-tuning, evaluation, and product iteration across successive model generations. The copies made to build the first Lyria model were stored in Google's systems, reused to train Lyria 2, reused again to train Lyria 3, and remain in Google's possession today.

105. Commercial voiceprint holders have filed four primary class actions against Alphabet and/or Google for BIPA violations. On March 1, 2016, commercial photograph biometric face template identifiers filed a class action lawsuit against Google, *Rivera v. Google Inc.*, No. 1:16-cv-02714 (N.D. Ill. 2016), which settled for $100 million. In April 2021, class actions initially filed in Illinois state courts on behalf of school children whose voices and faces were placed on Google's AI platform in voice and face models were removed to the Central District of Illinois, *Farwell v. Google LLC*, 1:21-cv-01122 (C.D. Ill. 2021) and *H.K. et al. v. Google, LLC*, No. 1:21-cv-01122 (C.D. Ill. 2021), and eventually settled for $8.75 million. On May 11, 2025, commercial voiceprint holders and biometric identifiers filed a class action lawsuit against Alphabet, *Marin v. Alphabet, Inc.*, No. 1:26-cv-05438 (N.D. Ill. 2026).

106. The one primary action pending against Alphabet, the *Marin* action, alleged that Alphabet's "operating subsidiary Google LLC," "built its voice AI using the voices of real people, including some of the most accomplished broadcast journalists, investigative podcasters, and audiobook narrators working in the United States today. To create the foundational models that now power Gemini Live, NotebookLM Audio Overviews, YouTube auto-dubbing, Google Cloud Text-to-Speech, and Google Assistant on more than a billion devices, Google ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures, the voiceprints, of the speakers from those recordings. Alphabet failed to comply with BIPA, which:

> [R]ecognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection, along with a written release. 740 ILCS 14/15(b). Google failed to comply with any of those requirements as to the Plaintiffs.
>
> *****
>
> Google built that consent system for the voices it paid for. It built nothing for the hundreds of thousands of hours of speech on which it pretrained the foundational models that now power its commercial voice business. Google

> knew how to obtain consent. It chose to obtain consent for some voices and not others. That was not an oversight. It was a business decision.
>
> The voiceprints Google extracted from Plaintiffs are not stored in a database that can be deleted on request. They are encoded in the parameters of Google's commercial voice models and reproduced in the audio that those models generate. At this point, the biometric data and the product are the same thing.
>
> Plaintiffs' injuries are concrete and particularized. Google extracted their voiceprints without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. Google retains those voiceprints in its commercial models and continues to profit from them. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living.

**F. Materially False and Misleading Statements and Omissions in Alphabet's Proxy Statements**

107. Defendants also made or approved false statements in various Alphabet filings with the SEC, including misstatements and omissions in the Company's annual proxy filings, all of which were approved by the Director Defendants.

108. On March 26, 2024, Alphabet filed its annual Proxy Statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). The 2024 Proxy Statement was reviewed and authorized by each of the Director Defendants and was filed in connection with the 2024 stockholder meeting to elect all of the Director Defendants, among other things.

109. The Director Defendants caused false statements and material omissions to be included in the 2024 Proxy Statement, which stated that Alphabet's Board was focused on "Key Transparency" for the Board to conform with "Responsible AI." The 2024 Proxy Statement directed stockholders to gain access to "AI Principles," "AI Principles Annual Update," "Responsible AI Practices," and "Visit our AI website for additional disclosures" and "Learn more about our efforts for AI blog." For "Responsible AI," the 2024 Proxy Statement declared:

> As an information and computer science company, we aim to and have been at the forefront of advancing the frontier of AI through our path-breaking and field-defining research to develop more capable and useful AI. ***Oversight of risks and exposures associated with AI is effectively carried***

> ***out at both our Board and Audit and Compliance Committee levels***. Given AI's importance and prominence for our business, it has been a long-standing topic that is regularly and extensively covered at our full Board meetings. ***Our Board receives regular reports and updates from our senior management (in addition to what the Audit and Compliance Committee receives from our senior management) who are immersed, on a daily basis, in the implementation of our AI Principles that are designed to provide safe, secure, and trustworthy AI development across products. These reports and regular discussions ensure that our Board is fully involved in the oversight of the company's business strategies and plans as they relate to AI, as well as any issues that may arise that may impact the company's risk exposures***.
>
> We have been incorporating AI into our products and services for more than two decades. We believe it is important to consider the consequences and impact of a new technology before releasing it, and ***we have been transparent about the implementation of our AI Principles, which guide our bold and responsible approach to AI. In 2018, we were one of the first companies to commit to AI Principles, and since 2019, we have provided consistent transparency of how we put them into practice in our annual AI Principles Updates***.
>
> We provide more information on our AI approach, responsibilities, and principles on our annual AI Principles Updates, our AI website, and our AI blog.

110. The 2024 Proxy Statement also included the Director Defendants' specific false and misleading statements based on Alphabet's AI CVMs to undermine stockholder proposals.

111. "Proposal Number 11: Stockholder Proposal Regarding AI Principles and Board Oversight," stated that in 2018, "Alphabet launched its Artificial Intelligence (AI) Principles …. [h]owever, there is evidence which suggests that the AI Principles have not been successfully implemented." The stockholder further stated that:

> Corporate governance is very important when it comes to AI and it is unclear to us how Alphabet's board is resolving tensions and prioritization challenges that arise between its AI Principles and its financial goals. While the Audit and Compliance Committee charter covers data privacy and security & civil and human rights, we believe the critical nature of AI to the company and its shareholders calls for expressly articulated coverage.

112. The Director Defendants opposed the proposal by stating that:

> We believe the oversight of risks and exposures associated with AI is already appropriately covered in the current Audit Committee Charter and, more importantly, already being effectively carried out at both our Board and Audit Committee levels.
>
> *****
>
> In 2018 we were one of the first companies to publish AI Principles, which guide our bold and responsible approach to AI. Since 2019, we have provided consistent transparency into how we implement those principles in our products and services. Implementation of our AI Principles requires robust internal governance and risk management frameworks, and our senior management continues to oversee both new and emerging issues in AI. We integrate our AI review work into our enterprise risk management frameworks and tools to provide first-line reviews of AI-related issues and help assure compliance with evolving laws, regulations, and standards. At the management and operational level, our AI governance teams collaborate closely with teams such as Privacy, Trust & Safety, and Security, as well as with subject matter experts across fields like machine-learning research, product policy, user-experience, public policy, law, human rights, and the social sciences.
>
> *****
>
> Our Board's oversight function of major risks and risk exposures, including those relating to or resulting from our development and implementation of AI in our products and services, sits at the top of our risk management framework.
>
> *****
>
> Our full Board meetings have regularly and extensively covered AI issues. Our Audit Committee and senior management provides our Board with reports and updates regarding issues and risk exposures regarding AI development. These discussions ensure that our Board is fully involved in the oversight of our business strategies and plans as they relate to AI.
>
> *****
>
> AI is important to our core operations and may impact any and all areas of risks relevant to our business, including financial, operational, data privacy and security, competition, legal, regulatory, compliance, child safety, civil and human rights, sustainability, and reputational risks. The broad categories in the Audit Committee's Charter allow the Committee to be nimble and flexible as risks arise and evolve. The Audit Committee has and continues to regularly receive reports from our senior management on our development of new AI technology and integration of this technology into our products and services, our business plans and strategies as they relate to AI, and other AI-related matters.

113. "Proposal Number 12: Stockholder Regarding a Report on Generative AI Misinformation and Disinformation Risks" focused on that "Generative Artificial

Intelligence (gAI) threatens to amplify misinformation and disinformation, as exemplified by reports about Bard, Gemini, and other Alphabet AI-driven products, including targeted ads, compromising human rights and democratic processes." The stockholder further stated that:

> While Alphabet publicly acknowledges the risks of AI and the need for reliable guardrails, it continues to "supercharge" gAI product development without addressing the existential threats posed by the technology, undermining Google's established human rights commitments.
>
> *****
>
> Shareholders are concerned that Alphabet incurs significant legal, financial, and reputational risks because of its rapid development and deployment of gAI products, absent parallel assessments of the threats they pose to the Company and society.

114. The Director Defendants opposed the proposal by stating that:

> We published our AI Principles in 2018 to hold ourselves accountable for how we research and develop AI, including generative AI. Google's enterprise risk frameworks, product policies, and tools provide a foundation for identifying and mitigating AI-generated mis/disinformation and other potential risks.
>
> *****
>
> We regularly review AI models and systems, including generative AI applications. As the technology evolves, we are expanding our evaluation and testing of new models and we provide regular updates on our work to ensure that we develop and deploy AI responsibly.
>
> *****
>
> We have established policy frameworks that set guardrails on the types of content our models generate. We regularly review and update the content and enforcement of these policies in response to emerging risks and new product features. We also have terms of service that prohibit improper use of our generative AI models and applications.
>
> *****
>
> We continually strive to improve the quality of our generative AI models and applications, through both pre-launch testing and ongoing fine-tuning, which allows us to learn from mistaken outputs and improve model performance over time. We provide transparency into this ongoing work via public reporting.

115. On April 25, 2025, Alphabet filed its annual Proxy Statement on report on Schedule 14A with the SEC (the "2025 Proxy Statement"). The 2025 Proxy Statement was reviewed and authorized by each of the Director Defendants and was filed in connection with the 2025 stockholder meeting to elect all of the Director Defendants, among other things.

116. The Director Defendants in the 2025 Proxy Statement eliminated previously false and misleading statements in the 2024 Proxy Statement, which stated that Alphabet's Board was focused on "Key Transparency" for the Board to conform "Responsible AI." The Director Defendants eliminated these statements because they were well aware that they should not have been placed in the 2024 Proxy Statement.

117. The 2025 Proxy Statement did, however, also include the Director Defendants' additional specific false and misleading statement based on Alphabet's AI CVMs to undermine stockholder proposals.

118. "Proposal Number 11: Stockholder Proposal Regarding a Report on AI Data Usage Oversight" focused on the fact that "[t]he immense and transformative potential of artificial intelligence comes with substantial risks." The stockholder's "Report on AI Data Usage Oversight" articulated that:

> The development and training of AI systems rely on vast amounts of data, and public information available via the Internet may not be enough to quench developers' insatiable thirst for high-quality training data. Thus, stakeholders are concerned that developers will draw from sources in an unethical or illegal manner.
>
> *****
>
> Some outlets project that the "unrivaled" data access and dominance in the search market of subsidiary Google will position Alphabet to eventually overtake its AI competitors[8] and be the first to establish dominance in the generative AI market. Given Alphabet's suspect record on data ethics, shareholders, consumers, and businesses should be concerned that the Company's AI expansion will drive further misconduct.
> Past abuses include:
>
> - On behalf of the European Union, Ireland's Data Protection Commission has opened an inquiry into one of Alphabet's AI models, which could be a "'high risk to the rights and freedoms of individuals' in the EU."

- Google settled a "class-action suit that sought damage payments of at least $5 billion" for "pervasively tracking their internet use through browsers set in 'private' mode." The Company agreed to delete all the data collected.

- Google abandoned plans to remove third-party cookies from its Chrome browser after advertisers expressed concerns about the effectiveness of Google's personalized advertising – Alphabet's largest revenue driver. The reversal drew scrutiny from the United Kingdom's Competition and Markets Authority, which argued that "concerns remain."

- The Company has longstanding ties with U.S. intelligence agencies, which raises concerns about Alphabet's role in surveillance on US citizens.

These are just a few of Alphabet's many privacy and ethics violations.

Prioritizing data ethics in Alphabet's AI development will help avoid harmful fiduciary and regulatory consequences. Developers who prioritize ethical data usage will reap the benefits of consumer trust, while those that do not will suffer.

Alphabet's position in the AI arms race, and its associated historic valuation, hang in the balance.

119. The Director Defendants opposed the proposal by stating that:

**Our AI and data governance and management structures provide effective oversight of key risks related to AI development and data usage**

Google operates an authoritative, comprehensive, and auditable system of record for all of our AI assets, including our models, our applications, and the workflows that produce them. This system is foundational to our commitment to AI safety and governance. We annotate all AI assets with detailed tracking of data origins and usage (auditable lineage). This detailed tracking is designed to meet our internal compliance standards and to address emerging legislation, such as the European Union's AI Act, ensuring transparency and accountability in our AI development processes.

In addition, Google is deeply committed to user privacy and maintains protocols regarding private data and tracking. Our policies are designed to protect user privacy and safety through responsible data practices, including limits on the personal information that is used and saved, use of advanced privacy technologies to help keep personal information private, and privacy protocols followed throughout the product development lifecycle. We understand the importance of safeguarding user information and have implemented measures to protect it. We also provide our users with clear and accessible information about how their data is used and offer them meaningful privacy controls. We employ advanced security technologies

and practices to protect user data from unauthorized access, use, or disclosure. And we are committed to complying with all applicable privacy laws and regulations, such as the European Union's General Data Protection Regulation.

We take seriously the risks to AI safety and security stemming from the improper use of external data. We have implemented governance processes for our AI launches. This includes governance of the data used in generative AI launches to ensure compliance with our ethical standards and legal requirements. We also conduct extensive safety evaluations to identify and mitigate potential risks associated with data use and model behavior.

**We actively collaborate with the broader online ecosystem, informed by our AI Principles, to advance privacy standards and mitigate security risks**

Google is committed to responsibly using data. In 2023, we published an update on web publisher controls (https://blog.google/technology/ai/an-update-on-web-publisher-controls/), providing a clear and easy-to-use mechanism for publishers to opt out of having data on their sites crawled for Google's AI training. We track and implement these opt-out requests in line with Google-Extended, a control that publishers can use to manage whether their sites help improve Bard and Vertex AI generative APIs.

*****

We believe our AI and data governance and management structures and continued work with regulators and the broader community on our initiatives address the concerns raised by the proponent. Moreover, we continuously monitor the evolving landscape of AI and regulation to proactively address emerging risks and ensure long-term compliance. Consequently, our Board believes adopting this proposal would not be in the best interests of the company and our stockholders.

120. On April 24, 2026, Alphabet filed its annual Proxy Statement on report on Schedule 14A with the SEC (the "2026 Proxy Statement"). The 2026 Proxy Statement was authorized by each of the Director Defendants and was filed in connection with the 2026 stockholder meeting to elect all the Director Defendants, among other things.

121. The Director Defendants in the 2026 Proxy Statement continued to eliminate false and misleading statements that were placed in the 2024 Proxy Statement to mislead stockholders into believing that Alphabet's Board was focused on "Key Transparency" for the Board to conform "Responsible AI." The Director Defendants

eliminated these statements, because they were actually aware that the statements should not have been placed in the 2024 Proxy Statement.

122. As in the 2024 Proxy Statement and the 2025 Proxy Statement, the 2026 Proxy Statement included more of the Director Defendants' specific false and misleading statements based on Alphabet's AI CVMs to undermine stockholder proposals.

123. "Proposal Number 12: Shareholder Proposal Regarding AI Board Oversight" requested that Alphabet's Board "update the Audit Committee (the "Committee") Charter to provide formal oversight on the responsible development and deployment of artificial intelligence ("AI") and AI-related risks that may impact the human rights of users and other stakeholders, including reviewing and discussing with the full Board matters deemed by the Committee to be significant on Alphabet's AI strategies, policies and initiatives; public policy and regulatory risks pertaining to AI; and implementation of Alphabet's policies governing the development and deployment of AI." The stockholder described the Audit Committee Defendants' failure to conform Alphabet's AI obligations:

> In October 2025, Alphabet amended its Audit Committee Charter ("Charter") and Risk and Compliance Committee Charter to remove oversight of civil and human rights, which was formally integrated in 2020. As the company ramps up its investment in AI, this rollback leaves an accountability gap around responsible AI governance addressing human rights risks. The fast pace of investments and implementation of AI in the coming years warrants the board's attention to these issues. The development and deployment of AI may create new unforeseen risks to the human rights of billions of users and stakeholders or exacerbate existing risks, thus increasing Alphabet's risk exposure. At present, the Charter is unclear as to whether the board formally oversees material AI-related risk and implementation of its responsible AI policies.
>
> Alphabet acknowledged that its "evolving AI-related efforts may give rise to risks related to harmful content, inaccuracies, discrimination, intellectual property infringement or misappropriation, violation of rights of publicity, defamation, data privacy, cybersecurity, and other issues […] [Its] implementation of AI systems could subject [Alphabet] to competitive harm, regulatory action, legal liability".

Oversight of AI vested in the Committee would ensure that the Board has the specialized expertise and dedicated focus needed to evaluate the risks, opportunities and compliance obligations unique to the AI systems that Alphabet develops and deploys. This is an increasingly common practice in the industry and is aligned with peers such as Microsoft, eBay, Cisco, and Comcast, which have assigned the oversight on AI, responsible AI, or AI-related risks to at least one Board committee.

Poor AI governance may lead to greater risk exposure and may in turn cost more to address any necessary changes. As illustrated by a recent derivative lawsuit settlement between shareholders and Alphabet, unaddressed vulnerabilities in AI governance systems may eventually lead to costly and resource-intensive interventions, whether they result from regulatory enforcement, litigation, or voluntary reforms. Proactive and effective AI governance aligning with best practice would reduce the likelihood of the risk to materialize and the scale of eventual remedy costs.

Formalizing AI oversight in the Charter is therefore a sound corporate governance exercise that would assure shareholders that the Board oversees material risks related to the development and deployment of responsible AI within Alphabet's long-term growth strategy.

124. The Director Defendants opposed the proposal by stating that:

**Our integrated internal governance and risk management protocols effectively manage AI risks.**

We are committed to a principled approach to AI governance that renders this proposal unnecessary. Our commitment is operationalized through a robust, multi-layered approach prioritizing responsible innovation. Appropriate risk management starts at the operational level, where our systems, processes, and protocols seek to identify and mitigate risks posed by our AI activities. We have been bringing AI into our products and services for more than two decades and regularly consider the risks and benefits of new technologies before release.

Our senior management continues to oversee emerging issues in AI, integrating our AI review work into enterprise risk management frameworks to promote compliance with evolving laws and standards. Our AI governance teams collaborate closely with subject matter experts across privacy, security, trust and safety, and human rights.

*****

AI strategy is a long-standing topic that is regularly and extensively covered at full Board meetings. These regular discussions mean that the entire Board — not just a single committee — oversees our business strategies and plans as they relate to AI, ensuring clear accountability.

> *****
>
> AI is fundamental to our core operations and may impact many areas of risk, including privacy and data governance, competition, legal, regulatory, compliance, online child welfare, civil and human rights, human capital management, and reputational risks.
>
> *****
>
> **We pioneered industry-leading transparency on AI responsibility**.
>
> In 2018, we were one of the first companies to publish AI Principles, which guide our bold and responsible approach to AI. Since 2019, we have provided regular transparency into how we implement those principles, and we continue to lead the industry in disclosure and accountability:
>
> - **Annual Responsible AI Progress Report:** Most recently, in February 2026, we published our latest annual update detailing how we govern, map, measure, and manage AI risk throughout the development lifecycle. Our update highlights our progress in building out governance structures for AI product launches and provides detailed insights into our policies and processes for developing advanced systems.
>
> - **Detailed Technical Disclosures:** We provide transparency through model cards and technical reports — such as those for Gemini and other models — which offer evaluation results using industry benchmarks and outline methods for identifying and mitigating issues.

125. "Proposal Number 14: Shareholder Proposal Regarding a Report on AI Data" informed stockholders that "[t]he immense and transformative potential of [AI] comes with substantial risks":

> The development and training of AI systems rely on vast amounts of data, and information available via the Internet may no longer satisfy developers' growing demand for high-quality source inputs. Thus regulators, investors, and consumers are concerned that developers will draw from unethical or illegally-obtained sources – such as personal information collected online, copyrighted works, and proprietary commercial information provided by users.
>
> *****
>
> Some outlets project that the "unrivaled" data access and dominance in the search market of subsidiary Google positions Alphabet to eventually overtake its AI competitors[11] and establish dominance in the generative AI market. Alphabet has already introduced AI features into its major businesses, to great effect. Considering Alphabet's suspect record on data ethics, shareholders, consumers, and businesses should be concerned that the Company's AI expansion will drive further misconduct.

Past abuses include:

*****

- Google abandoned plans to remove third-party cookies from its Chrome browser after advertisers expressed concerns about the effectiveness of Google's personalized advertising – Alphabet's largest revenue driver.

- The Company has longstanding ties with U.S. intelligence agencies, which raises concerns about Alphabet's role in surveillance on US citizens.

These are just a few of Alphabet's many privacy and ethics violations.

Prioritizing data ethics in Alphabet's AI development will help avoid harmful reputational, fiduciary, regulatory and litigative consequences. Developers who prioritize ethical data usage will reap the benefits of consumer trust, while those that do not will suffer.

Alphabet's position in the AI arms race, and its associated historic valuation, hang in the balance.

126. The Director Defendants opposed the proposal by stating that:

**Our AI and data governance and management structures provide effective oversight of key risks related to AI development and data usage**.

We operate an authoritative, comprehensive, and auditable system of record for all of our AI assets, including our models, our applications, and the workflows that produce them. This system is foundational to our commitment to AI safety and governance. We annotate all AI assets with detailed tracking of data origins and usage (auditable lineage). This detailed tracking is designed to meet our internal compliance standards and to address emerging legislation, such as the European Union's AI Act, enhancing transparency and accountability in our AI development processes.

In addition, we are deeply committed to user privacy and maintain protocols regarding private data and tracking. Our policies are designed to protect user privacy and safety through responsible data practices, including limits on the personal information that is used and saved, use of advanced privacy technologies to help keep personal information private, and privacy protocols followed throughout the product development lifecycle. We understand the importance of safeguarding user information and have implemented measures to protect it. We also provide our users with clear and accessible information about how their data is used and offer them meaningful privacy controls. We employ advanced security technologies and practices to protect user data from unauthorized access, use, or disclosure. And we are committed to complying with all applicable privacy

> laws and regulations, such as the European Union's General Data Protection Regulation.
>
> We take seriously the risks to AI safety and security stemming from the improper use of external data. We have implemented governance processes for our AI launches. This includes governance of the data used in generative AI launches in line with our ethical standards and legal requirements. We also conduct extensive safety evaluations to identify and mitigate potential risks associated with data use and model behavior.
>
> **We actively collaborate with the broader online ecosystem to advance privacy standards and mitigate security risks**.
>
> Google is committed to responsibly using data. In 2023, we published an update on web publisher controls, providing a clear and easy-to-use mechanism for publishers to opt out of having data on their sites crawled for Google's AI training. We track and implement these opt-out requests and continue to expand the controls publishers can use to manage whether their sites help improve various Google products.
>
> Our AI work conforms to our Secure AI Framework, which we designed to mitigate security risks specific to AI systems across the public and private sectors. That Framework is part of our commitment to protecting privacy and security across the internet.
>
> *****
>
> We believe our AI and data governance and management structures and continued work with regulators and the broader community on our initiatives address the concerns raised by the proponent. Moreover, we continuously monitor the evolving landscape of AI and regulation to address emerging risks and facilitate long-term compliance. Consequently, our Board believes that adopting this proposal would not be in the best interests of the company and our shareholders.

127. These statements were materially false and misleading because they led the market and the Company's shareholders to believe that Alphabet had complied with all laws, including copyright and BIPA laws, in the development of its AI. In a similar vein, the statements in the Proxy contained material omissions because the Proxy failed to disclose the material fact that Alphabet had trained its AI using vast amounts of data for which it had not obtained the necessary licenses or permissions, and thus that the Company was at material risk of lawsuits from copyright and voiceprint holders.

128. These statements and omissions were made at a time when all Defendants knew or should have known that other AI developers had been sued by copyright and voiceprint holders for using datasets that included unlicensed materials, and that the datasets used by Alphabet did not develop Responsible AI for all copyright and voiceprint holders, and that Defendants were not "immersed, on a daily basis, in the implementation of our AI Principles that are designed to provide safe, secure, and trustworthy AI development across products." At best, the Director Defendants acted recklessly in making representations regarding Alphabet's practices given the copyright claims associated with LAION-400M, C4, YouTube, and human speech recordings.

**G. Share Repurchases**

129. During the same time period that Alphabet was developing its AI platforms based on the use of unauthorized use of copyrighted works in developing Alphabet's LLMs and CVMs, the Board, which was directly responsible for the Company's stock repurchase program, caused Alphabet to repurchase its own common stock at prices that were artificially inflated by the materially false and misleading statements and omissions in Alphabet's SEC filings. The Board authorized multiple share repurchase programs in recent fiscal years, while aware of the true extent of the Company's copyright and BIPA infringement on its AI platforms and datasets, and the false and misleading Proxy Statements and Annual Reports. In April 2023, 2024, and 2025, the Board authorized a share repurchase program up to $70 billion Class A and Class C shares.

130. As of December 31, 2023, Alphabet had repurchased approximately 528 million shares under this program for a total amount of $62.184 billion: (i) 6.163 million Class A shares purchased at an average price of $106.53 per share, and 41.151 million Class C shares at an average price of $106.94 per share, between April 1, 2023 to April 30, 2023; (ii) 5.490 million Class A shares purchased at an average price of $116.89 per share, and 38.571 million Class C shares at an average price of $116.97 per share, between May 1, 2023 to May 31, 2023; (iii) 4.941 million Class A shares purchased at an average price of $123.29 per share, and 34.664 million Class C shares at an average price of $123.88 per

share, between June 1, 2023 to June 30, 2023; (iv) 3.647 million Class A shares purchased at an average price of $124.11 per share, and 36.664 million Class C shares at an average price of $125.22 per share, between July 1, 2023 to July 31, 2023; (v) 4 million shares purchased at an average price of $132.61 per share, and 39.758 million Class C shares at an average price of $132.16 per share, between August 1, 2023 to August 31, 2023; (vi) 6 million shares purchased at an average price of $135.44 per share, and 31.408 million Class C shares at an average price of $135.90 per share, between September 1, 2023 to September 30, 2023; (vii) 9.923 million shares purchased at an average price of $134.66 per share, and 38.687 million Class C shares at an average price of $135.65 per share, between October 1, 2023 to October 31, 2023; (viii) 9.197 million shares purchased at an average price of $134.53 per share, and 28.198 million Class C shares at an average price of $135.16 per share, between November 1, 2023 to November 30, 2023; and (ix) 7.5 million shares purchased at an average price of $135.76 per share, and 24.76 million Class C shares at an average price of $136.37 per share, between December 1, 2023 to December 31, 2023.

131. As of December 31, 2024, Alphabet had repurchased approximately 379 million shares under this program, for a total amount of $62.047 billion: (i) 9.717 million Class A shares purchased at an average price of $145.11 per share, and 29.623 million Class C shares at an average price of $146.28 per share, between January 1, 2024 to January 31, 2024; (ii) 7.568 million Class A shares purchased at an average price of $143.82 per share, and 28.804 million Class C shares at an average price of $144.75 per share, between February 1, 2024 to February 29, 2024; (iii) 5.949 million Class A shares purchased at an average price of $143.08 per share, and 29.230 million Class C shares at an average price of $143.86 per share, between March 1, 2024 to March 31, 2024; (iv) 8.101 million Class A shares purchased at an average price of $159.68 per share, and 28.903 million Class C shares at an average price of $160.18 per share, between April 1, 2024 to April 30, 2024; (v) 6.38 million shares purchased at an average price of $172.74 per share, and 23.177 million Class C shares at an average price of $174.14 per share, between May 1, 2024 to

May 31, 2024; (vi) 4.849 million shares purchased at an average price of $179.38 per share, and 20.397 million Class C shares at an average price of $179.75 per share, between June 1, 2024 to June 30, 2024; (vii) 6.23 million shares purchased at an average price of $181.08 per share, and 24 million Class C shares at an average price of $182.81 per share, between July 1, 2024 to  July 31, 2024; (viii) 6.109 million shares purchased at an average price of $165.21 per share, and 24.867 million Class C shares at an average price of $166.46 per share, between August 1, 2024 to August 31, 2024; (xi) 4.431 million shares purchased at an average price of $159.86 per share, and 24.451 million Class C shares at an average price of $160.26 per share, between September 1, 2024 to September 30, 2024; (x) 5.792 million shares purchased at an average price of $167.66 per share, and 30.08 million Class C shares at an average price of $168.84 per share, between October 1, 2024 to October 31, 2024; (xi) 4.325 million shares purchased at an average price of $174.97 per share, and 22.45 million Class C shares at an average price of $175.98 per share, between November 1, 2024 to November 30, 2024; and (x) 3.559 million shares purchased at an average price of $187.07 per share, and 19.572 million Class C shares at an average price of $187.52 per share, between December 1, 2024 to December 31, 2024.

132. As of December 31, 2025, Alphabet had repurchased approximately 240 million shares under this program, for a total amount of $45.398 billion: (i) 3.884 million Class A shares purchased at an average price of $197.44 per share, and 21.503 million Class C shares at an average price of $198.13 per share, between January 1, 2025 to January 31, 2025; (ii) 4.749 million Class A shares purchased at an average price of $185.61 per share, and 22.382 million Class C shares at an average price of $187.68 per share, between February 1, 2025 to February 29, 2025; (iii) 6.707 million Class A shares purchased at an average price of $166.64 per share, and 24.239 million Class C shares at an average price of $168.09 per share, between March 1, 2025 to March 31, 2025; (iv) 8.471 million Class A shares purchased at an average price of $155.60 per share, and 24.689 million Class C shares at an average price of $157.25 per share, between April 1, 2025 to April 30, 2025;

(v) 4.529 million shares purchased at an average price of $164.95 per share, and 22.447 million Class C shares at an average price of $166.17 per share, between May 1, 2025 to May 31, 2025; (vi) 2.71 million shares purchased at an average price of $174.18 per share, and 17.853 million Class C shares at an average price of $174.39 per share, between June 1, 2025 to June 30, 2025; (vii) 2.571 million shares purchased at an average price of $185.81 per share, and 19.08 million Class C shares at an average price of $186.76 per share, between July 1, 2025 to July 31, 2025; (viii) 1.548 million shares purchased at an average price of $203.08 per share, and 17.148 million Class C shares at an average price of $203.43 per share, between August 1, 2025 to August 31, 2025; (xi) 551,00,000 shares purchased at an average price of $241.96 per share, and 14.738 million Class C shares at an average price of $242.62 per share, between September 1, 2025 to September 30, 2025; (x) 841,000,000 shares purchased at an average price of $253.20 per share, and 13.305 million Class C shares at an average price of $255.03 per share, between October 1, 2025 to October 31, 2025; and (xi) 209,000,000 shares purchased at an average price of $286.00 per share, and 5.855 million Class C shares at an average price of $281.46 per share, between November 1, 2025 to November 30, 2025.

133. Total share repurchases were 1.147 billion shares, at a total purchase price of $169.629 billion. All of these repurchases were made at times when the Defendants knew, but had failed to disclose, the Company's copyright and BIPA infringement on its AI platforms and datasets. As a result, the Company paid artificially inflated prices to buy its own shares.

## VI. DAMAGES TO ALPHABET

134. Alphabet is significantly damaged by Defendants' misconduct. Due to Defendants' failure to take required steps to eliminate copyrighted works and commercialized voiceprints from copyrighted holders, content creators, and commercialized speakers from Alphabet's AI datasets, Alphabet will be subject to potentially massive liability from the copyright infringement and BIPA class actions. This

includes not only the potential costs to resolve the litigation, but also legal fees, loss of goodwill, reputational damage, and lost customers, among other things.

135. Alphabet was further damaged by the Officer Defendants' unjust enrichment. Pichai earned extensive compensation and shares during the relevant period, as the Defendants' false statements and stock repurchases caused Alphabet's stock to be inflated. Pichai was awarded over $30 million in compensation for 2023-2025, and as of April 24, 2025, Pichai was awarded 1,348,507 unvested shares valued at $423,192,877, and 1,642,724 vested shares valued at $336,172,535. Askkenazi was awarded $81.3 million in compensation for 2024-2025; Porat was awarded $86.6 million in compensation for 2023-2025; and Walker was awarded $86.6 million for 2023-25.

136. The Director Defendants received the following compensation for 2025:

| Name | Fees Earned or Paid in Cash | Stock Awards ($) | Total ($) |
|---|---|---|---|
| Frances H. Arnold | 75,000 | 362,396 | 437,396 |
| Marty Chavez | 75,000 | 362,396 | 437,396 |
| L. John Doerr | 75,000 | 362,396 | 437,396 |
| Roger W. Ferguson | 100,000 | 362,396 | 462,396 |
| John L. Hennessy | 100,00 | 517,529 | 617,529 |
| K. Ram Shriram | 75,000 | 362,396 | 437,396 |
| Robin L. Washington | 75,000 | 362,396 | 437,396 |

137. The Director Defendants received the following compensation for 2024:

| Name | Fees Earned or Paid in Cash | Stock Awards ($) | Total ($) |
|---|---|---|---|
| Frances H. Arnold | 75,000 | 370,681 | 445,681 |
| Marty Chavez | 75,000 | 373,259 | 448,259 |
| L. John Doerr | 75,000 | 370,693 | 445,693 |
| Roger W. Ferguson | 89,812 | 370,693 | 460,505 |

| | | | |
|---|---|---|---|
| John L. Hennessy | 100,000 | 529,546 | 629,546 |
| K. Ram Shriram | 75,000 | 370,693 | 445,693 |
| Robin L. Washington | 75,000 | 370,693 | 445,693 |

138. The Director Defendants received the following compensation for 2023:

| Name | Fees Earned or Paid in Cash | Stock Awards ($) | Total ($) |
|---|---|---|---|
| Frances H. Arnold | 75,000 | 348,392 | 423,392 |
| Marty Chavez | 75,000 | 348,392 | 423,392 |
| L. John Doerr | 75,000 | 348,392 | 423,392 |
| Roger W. Ferguson | 75,000 | 348,392 | 423,392 |
| John L. Hennessy | 100,000 | 497,633 | 597,633 |
| K. Ram Shriram | 75,000 | 348,392 | 423,392 |
| Robin L. Washington | 75,000 | 348,392 | 423,392 |

## VII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

139. Alphabet is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

140. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' wrongful conduct.

141. Plaintiff is a current stockholder of Alphabet and has continuously owned Alphabet common stock at all times relevant herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

142. A pre-suit demand on the Board of Alphabet is futile and, therefore, excused. At the time this action was commenced, the Board consisted of the ten Director Defendants: Pichai, Arnold, Brin, Chavez, Doerr, Ferguson, Hennessy, Page, Shriram, and

Washington. Because the current Board is comprised of an even number of directors, Plaintiff needs only to allege demand futility as to half the Board members, or in this case five out of the ten directors.

143. Delaware law applies a director-by-director "three-part test as the universal test for assessing whether demand should be futile." *United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034, 1057-58 (Del. 2021). The three-part test asks with respect to each Director: "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.*

### A. Each Demand Director Faces a Substantial Likelihood of Personal Liability for Lack of Oversight

144. The second inquiry in the demand futility test under Delaware law is whether a director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand. Here, each Director faces a substantial likelihood of liability for breaching his or her oversight duties in bad faith.

145. For a software company like Alphabet, intellectual property rights, including copyright and biometric information protections, is a ***mission critical issue*** to the Company. If third parties could violate Alphabet's copyright and biometric information protections willy-nilly, Alphabet's software would have no value and the Company's revenues would collapse. In a similar vein, if Alphabet violates the copyright and biometric information rights of other companies or persons, it exposes itself to substantial damages. Even worse, if Alphabet's own software and datasets are developed in such a way that violates intellectual property, copyright protection, and biometric information rights, the consequences are dire, as Alphabet's software would be imbued with copyright and

biometric information violations, posing a much more substantial threat, as the legal violations would threaten the Company's recurring revenues from its software, thereby not only exposing it to damages but also adversely impacting its revenues, profits, and growth rate. That is what happened here under the Director Defendants' watch.

146. All ten of the Directors—Pichai, Arnold, Brin, Chavez, Doerr, Ferguson, Hennessy, Page, Shriram, and Washington—have been on the Board of Directors at all relevant times, including during the time that Alphabet committed the copyright and BIPA violations, and all Directors made the false and misleading statements. Thus, all ten Directors are interested because they face a substantial likelihood of liability for each of the claims asserted herein.

147. The tenure of the current Board is set forth in this chart:

| **Director** | **Joined Board** | **Approx. Tenure** |
|---|---|---|
| Larry Page | 1998 | 28 |
| Sergey Brin | 1998 | 28 |
| Sundar Pichai | 2017 | 9 |
| John Hennessey | 2004 | 22 |
| Francis Arnold | 2019 | 7 |
| Marty Chavez | 2022 | 4 |
| John Doerr | 1999 | 27 |
| Roger Ferguson | 2016 | 10 |
| Ram Shriram | 1998 | 28 |
| Robin Washington | 2019 | 7 |

148. The Directors also failed to act on numerous red flags related to Alphabet's copyright and BIPA infringement. On April 19, 2023, Washington Post published an article, "*Inside the Secret List of Websites That Make AI Like ChatGPT Sound Smart*":[16]

[16] Kevin Schaul, *et al.*, *Inside the Secret List of Websites that Make AI Like ChatGPT Sound Smart*, WASH. POST (Apr. 19, 2023).

[W]e analyzed Google's C4 data set, a massive snapshot of the contents of 15 million websites that have been used to instruct some high-profile English-language AIs, called large language models, including Google's T5 and Facebook's LLaMA.

*****

The data set was dominated by websites from industries including journalism, entertainment, software development, medicine and content creation, helping to explain why these fields may be threatened by the new wave of artificial intelligence. The three biggest sites were patents.google.com, which contains text from patents issued around the world; wikipedia.org, the free online encyclopedia; and scribd.com, a subscription-only digital library. Also high on the list: b-ok.org, a notorious market for pirated e-books that has since been seized by the U.S. Justice Department. At least 27 other sites identified by the U.S. government as markets for piracy and counterfeits were present in the data set.

*****

The Post's analysis suggests more legal challenges may be on the way: The copyright symbol — which denotes a work registered as intellectual property — appears more than 200 million times in the C4 data set.

*****

Technology is the second largest category, making up 15 percent of categorized tokens. This includes many platforms for building websites, like sites.google.com, which hosts pages for everything from a Judo club in Reading England to a Catholic preschool in New Jersey.

******

Tech giants like Facebook and Google that are sitting on mammoth troves of conversational data have not been clear about how personal user information may be used to train AI models that are used internally or sold as products.

*****

Like most companies, Google heavily filtered the data before feeding it to the AI. (C4 stands for Colossal Clean Crawled Corpus.). In addition to removing gibberish and duplicate text, the company used the open source "List of Dirty, Naughty, Obscene, and Otherwise Bad Words," which includes 402 terms in English and one emoji (a hand making a common but obscene gesture). Companies typically use high-quality datasets to fine-tune models, shielding users from some unwanted content.

*****

A web crawl may sound like a copy of the entire internet, but it's just a snapshot, capturing content from a sampling of webpages at a particular moment in time. C4 began as a scrape performed in April 2019 by the

> nonprofit CommonCrawl, a popular resource for AI models. CommonCrawl told The Post that it tries to prioritize the most important and reputable sites, but does not try to avoid licensed or copyrighted content.
>
> *****
>
> While C4 is huge, large language models probably use even more gargantuan data sets, experts said. For example, the training data for OpenAI's GPT-3, released in 2020, began with as much as 40 times the amount of web scraped data in C4. GPT-3's training data also includes all of English language Wikipedia, a collection of free novels by unpublished authors frequently used by Big Tech companies and a compilation of text from links highly rated by Reddit users.

149. In April 2024, the *New York Times* published an article that reported Google had pulled audio from YouTube videos to train its AI models: "How Tech Giants Cut Corners to Harvest Data for A.I."[17] This is material information that disclosed Google's training practices on YouTube content were comparable to scraping practices that Alphabet could not establish to conform with legal obligations:

> Google transcribed YouTube videos to harvest text for its A.I. models, five people with knowledge of the company's practices said. ***That potentially violated the copyrights to the videos, which belong to their creators***.
>
> Last year, Google also broadened its terms of service. One motivation for the change, according to members of the company's privacy team and an internal message viewed by The Times, was to allow Google to be able to tap publicly available Google Docs, restaurant reviews on Google Maps and other online material for more of its A.I. products.
>
> *****
>
> Google and Meta, which have billions of users who produce search queries and social media posts every day, were largely limited by privacy laws and their own policies from drawing on much of that content for A.I.
>
> Their situation is urgent. Tech companies could run through the high-quality data on the internet as soon as 2026, according to Epoch, a research institute. The companies are using the data faster than it is being produced.
>
> *****

[17] Metz, Cade, et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, The New York Times, Apr. 6, 2024.

> Google's rules allowed it to tap YouTube user data to develop new features for the video platform. But it was unclear whether Google could use YouTube data to build a commercial service beyond the video platform, such as a chatbot.
>
> *****
>
> In June, Google's legal department asked the privacy team to draft language to broaden what the company could use consumer data for, according to two members of the privacy team and an internal message viewed by The Times. The employees were told Google wanted to use people's publicly available content in Google Docs, Google Sheets and related apps for an array of A.I. products. The employees said they didn't know if the company had previously trained A.I. on such data.
>
> At the time, Google's privacy policy said the company could use publicly available information only to "help train Google's language models and build features like Google Translate."
>
> The privacy team wrote new terms so Google could tap the data for its "A.I. models and build products and features like Google Translate, Bard and Cloud AI capabilities," which was a wider collection of A.I. technologies

150. The Director Defendants were also well aware of red flags related to Alphabet's BIPA violations. On July 15, 2020, Biometric Update provided a news report entitled "Facial Biometrics Training Dataset Leads to BIPA Lawsuits Against Amazon, Alphabet and Microsoft":

> Amazon, Alphabet and Microsoft have been accused in three new proposed class-action lawsuits filed in federal court under Illinois' Biometric Information Privacy Act (BIPA) of analyzing images of people with biometrics without having obtained their permission, CNET reports, violating the law even as they attempted to train demographic disparity out of their systems.
>
> When the dataset was launched with a million publicly available images, IBM Fellow and Manager of AI Tech Dr. John Smith told *Biometric Update* that the move represented IBM putting its prioritization of fairness in AI into action. Some of those publicly available images are now alleged to have come from Illinois residents, whose likeness cannot be processed by companies using biometrics without informed consent.
>
> A pair of Illinois residents claim they clearly identified themselves as residents of Illinois, but their images were included in the dataset anyway. The lawsuits have been filed in federal courts in California and Washington, where the companies are based.

151. All ten Directors approved each of the Company's 2024, 2025, and 2026 Proxy Statements. The Director all approved a major change in the language in the 2025 and 2026 Proxy Statement that removed the prior, unequivocal statements in the prior years' proxy statements to the effect that Alphabet's Board was focused on "Key Transparency" for the Board to conform with "Responsible AI." The following chart demonstrates the omission:

| 2024 Proxy | 2025 Proxy | 2026 Proxy |
|---|---|---|
| As an information and computer science company, we aim to and have been at the forefront of advancing the frontier of AI through our path-breaking and field-defining research to develop more capable and useful AI. ***Oversight of risks and exposures associated with AI is effectively carried out at both our Board and Audit and Compliance Committee levels***. Given AI's importance and prominence for our business, it has been a long-standing topic that is regularly and extensively covered at our full Board meetings. ***Our Board receives regular reports and updates from our senior management (in addition to what the Audit and Compliance Committee receives from our senior management) who are immersed, on a daily basis, in the implementation of our AI Principles that are designed to provide safe,*** | No such language. | No such language. |

| | | |
|---|---|---|
| ***secure, and trustworthy AI development across products. These reports and regular discussions ensure that our Board is fully involved in the oversight of the company's business strategies and plans as they relate to AI, as well as any issues that may arise that may impact the company's risk exposures***.<br><br>We have been incorporating AI into our products and services for more than two decades. We believe it is important to consider the consequences and impact of a new technology before releasing it, and ***we have been transparent about the implementation of our AI Principles, which guide our bold and responsible approach to AI. In 2018, we were one of the first companies to commit to AI Principles, and since 2019, we have provided consistent transparency of how we put them into practice in our annual AI Principles Updates***. | | |

152. The Director Defendants consciously ignored these red flags. For these reasons, the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability for their wrong acts, such that demand on the Board to institute this action is excused as futile.

153. The Director Defendants' substantial likelihood of liability for their wrong acts is also demonstrated by their conduct in causing Alphabet to repurchase billions of dollars of its own stock at inflated prices. During the time that Alphabet was developing its LLMs and CVMs based on piracy datasets, the Board agreed to cause Alphabet to repurchase its own common stock at prices that were artificially inflated by the materially false and misleading statements and omissions in Alphabet's SEC filings.

154. In April 2023, April 2024, and April 2025, the Board—while aware of the true extent of the Company's infringement on its AI platforms and datasets, and the false and misleading Proxy Statements— each year authorized a share repurchase program of up to $70 billion.

155. From April 2023 to November 2025, Alphabet repurchased 1.147 billion shares, a total purchase price of $169.629 billion, at significantly inflated prices through a combination of accelerated repurchase agreements and open-market purchases. All these repurchases were made at times when the Defendants knew, but had failed to disclose, the Company's copyright and BIPA infringement on its AI platforms and datasets. As a result, the Company paid artificially inflated prices to buy its own shares

### B. Each Director Defendant Faces a Substantial Likelihood of Liability for Approving the Issuance of False and Misleading Statements

156. As explained above, the Individual Defendants caused Alphabet to issue numerous false and misleading disclosures during the Relevant Period, misrepresenting that Alphabet had not illegally trained its AI with any copyrighted material and biometric information and concealing the extent to which Alphabet had improperly used the copyrights and biometric information of other persons and companies.

157. The Director Defendants were ultimately responsible for the Company's public disclosures. Each Director Defendant approved one or more of the false and misleading statements alleged herein.

158. The Director Defendants together and individually, violated and breached their fiduciary duties of loyalty and acted in bad faith. The Director Defendants knowingly

approved and/or permitted the wrongs alleged herein and caused the Company to engage in copyright infringement and BIPA violations, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

159. The Director Defendants either knowingly or recklessly caused the Company to engage in copyright infringement and BIPA violation misconduct, and to issue the materially false and misleading statements alleged herein. The Director Defendants knowingly approved and/or permitted a business model to train Alphabet's AI products on a dataset that included copyrighted materials, commercial voice models, and knew of the falsity of the misleading statements in SEC filings at the time they were made. The Director Defendants thus face a substantial likelihood of liability and are not disinterested.

160. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's operations and the material events giving rise to these claims. Specifically, as Board members of Alphabet, the Director Defendants knew, or should have known, the material facts surrounding the Company's copyright infringement misconduct.

161. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

### C. Defendant Pichai is Interested and Received Improper Financial Benefits

162. Defendant Pichai was the CEO of the Company at relevant times and is not disinterested or independent. Pichai derived his sole employment income from Alphabet and does not qualify as an independent director, as Alphabet's proxy statements admit.

163. As alleged herein, Pichai was awarded unjust compensation in the aggregate amount of over $30 million in compensation for 2023-2025. As of April 24, 2025, Pichai was awarded 1,348,507 unvested shares valued at $423,192,877, and 1,642,724 vested shares valued at $336,172,535, based primarily on his stock award compensation. His massive compensation was unjust because he breached his fiduciary duties and issued false and misleading statements.

164. Further, Pichai has led Alphabet's establishment of the AI platforms, which subjects him substantially to the allegations of wrongdoing arising from many of the same events based on the same facts as alleged in this action, and the copyright infringement and BIPA violation actions. He is therefore interested in the claims asserted herein and demand is clearly futile as Pichai.

**D. All Directors are Interested Because They Received Improper Financial Benefits Directly Related to Their Wrongdoing**

165. Each of the Director Defendants is interested because they received improper financial benefits. To be clear, as particularly alleged herein, Plaintiff does not simply allege that the Directors Defendants received director fees. Instead, from 2023 to 2025 they received both cash fees and stock grants that were directly inflated due to the wrongdoing in which they directly participated.

166. Specifically, the Compensation Committee targets the equity compensation for the directors to be within the 25th to 75th percentile range of the peer group. The total shareholder return for Alphabet, however, was well below that of the peer group identified in the proxy. In addition, the Director Defendants caused the Company to violate copyrights, BIPA, and IP, to issue false and misleading statements, and to repurchase billions of dollars of the Company's stock at inflated prices. This conduct caused Alphabet's reported financial performance to be artificially inflated, thus directly inflating the financial metrics used by the Compensation Committee to set the Director Defendants' cash and stock compensation.

**E. Demand is Futile as to the Audit Committee Directors**

167. The Audit Committee Defendants (Chavez, Ferguson, and Washington) are not disinterested or independent, and therefore, are incapable of considering a demand because, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to the adequacy and effectiveness of technology security policies, internal controls regarding information and technology security, cybersecurity, and privacy related areas, compliance with related legal, regulatory and ethical requirements, and public disclosure requirements. The Audit Committee Defendants breached their fiduciary duties to the Company by permitting and facilitating Alphabet to conduct copyright and BIPA violations and failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's copyright infringement and BIPA violation misconduct and the adequacy of the Company's internal controls as alleged above. The Audit Committee Defendants therefore cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company and committing violations of the 1934 Act, as that would expose them to substantial liability and threaten their livelihood.

**F. Demand is Futile for Additional Reasons**

168. The Director Defendants, as members of the Board, were and are subject to Alphabet's and Google's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Defendants to also adhere to Alphabet's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to engage in copyright infringement and BIPA violation misconduct and make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

169. The Director Defendants' conduct was not the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As all of the directors face a substantial likelihood of liability, they are self-interested in the conduct challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as being futile.

170. The acts complained of herein constitute violations of fiduciary duties owed by Alphabet's officers and directors, and these acts are incapable of ratification.

171. The Director Defendants may also be protected against personal liability for their wrongful acts by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds—*i.e.*, monies belonging to Alphabet. Any directors' and officers' liability insurance policy covering the Director Defendants will contain provisions that eliminate coverage for any action brought directly by the Company against its officers and directors, generally known as the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Alphabet, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage will provide a basis for the Company to effectuate a recovery. Thus, demand on the Defendants is futile and, therefore, excused.

172. If there is no directors' and officers' liability insurance, then the directors will not cause Alphabet to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

173. Thus, there is no majority of disinterested directors among the Director Defendants and demand is excused as futile.

## CAUSES OF ACTION

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

174. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

175. Defendants owed and owe Alphabet fiduciary obligations. By reason of their fiduciary relationships, the Defendants owed and owe Alphabet the highest obligation of loyalty and care.

176. The Defendants and each of them, violated and breached their fiduciary duties.

177. The Officer Defendants either knew, were acting recklessly, and/or were grossly negligent in disregarding the unlawful activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless and/or were grossly negligent in not knowing that the Company and its statements concerning AI dataset were false and misleading. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company. The Officer Defendants are not entitled to the protection of the business judgment rule.

178. The Director Defendants breached their duty of loyalty by causing the Company to adopt and implement an unlawful business plan, pursuant to which Alphabet knowingly engaged in copyright infringement and BIPA violations in order to train its AI software. The strategy was carefully crafted to avoid spending the time and money necessary to obtain lawful licenses or permission from the copyright holders, and instead to simply pay damages later when Alphabet was sued by the copyright holders and commercial voiceprint holders. The Director Defendants knew or were reckless in not knowing that Alphabet's AI dataset process was explicitly predicated upon widespread and

blatant copyright infringement and BIPA violations. Accordingly, these defendants breached their duty of loyalty to the Company.

179. The Defendants also violated their fiduciary duties of loyalty and good faith by causing Alphabet to repurchase millions of its own shares during the relevant time period, despite knowing that such prices were artificially inflated due to the false statements Defendants caused Alphabet to make, as alleged more fully herein.

180. As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Alphabet has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

181. Plaintiff, on behalf of Alphabet, has no adequate remedy at law.

**COUNT II**

**Against All Defendants for Unjust Enrichment**

182. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

183. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, Alphabet.

184. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Alphabet that was tied to the performance or artificially inflated valuation of Alphabet, or received compensation that was unjust in light of the Defendants' bad faith conduct.

185. Plaintiff, as a shareholder and a representative of Alphabet, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

186. Plaintiff on behalf of Alphabet has no adequate remedy at law.

## COUNT III

### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

187. Plaintiff incorporates by reference and realleges each allegation contained above as though fully set forth herein, except to the extent those allegations plead fraud or intentional or knowing conduct by the Director Defendants. Plaintiff specifically disclaims any allegations of intentional or fraudulent misconduct with regard to this claim.

188. SEC Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits solicitation through a proxy statement or other communication "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." The Director Defendants recklessly and/or negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the Proxy Statements. The Proxy Statements contained proposals to the Company's stockholders urging them to re-elect the Director Defendants as members of the Board but misstated or failed to disclose the material information alleged herein.

189. By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) and Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding the Company's recommendations to re-elect the Board members up for election, approve the proposed executive compensation, and renew the contract of the outside auditor.

190. Plaintiff thereby seeks injunctive and equitable relief because the conduct of the Director Defendants is interfering with Plaintiff's voting rights and choices at the annual meetings.

191. This action was timely commenced within three years of the date of the Proxy Statements and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the Company and against all Individual Defendants as follows:

A. Declaring and determining that Plaintiff may maintain this action on behalf of Alphabet and that Plaintiff is an adequate representative of the Company;

B. Declaring and determining that the Defendants breached their fiduciary duties to Alphabet;

C. Declaring and determining that the Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by reason of the acts and omissions alleged herein;

D. Determining and awarding to Alphabet the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E. Directing Alphabet and the Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Alphabet and its stockholders from a repeat of the damaging events described herein, including, but not limited to, actions as may be necessary to ensure proper corporate governance policies to strengthen the internal audit and control functions and ensure the establishment of effective oversight of compliance with copyright and BIPA laws and all other applicable laws, rules, and regulations;

F. Awarding Alphabet restitution from Defendants, unjust enrichment and disgorgement of any benefits wrongly obtained by Defendants;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 30, 2026

Respectfully submitted,

*/s/ David T. Wissbroecker*

David T. Wissbroecker
david@saltlawgroup.com

**SALT**
100 SW Main Street, Suite 1025
Portland, OR 97204
Telephone: 503-417-7777
Facsimile: 503-214-8816
david@saltlawgroup.com

## VERIFICATION

I, Phil Rosen, verify that I am a shareholder of nominal defendant Alphabet, Inc. (the "Company"), and that I have continuously owned stock in the Company at all relevant times. I have reviewed the allegations in this Verified Stockholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 10-26-26

Phil Rosen